# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 74402-0-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| CHRISTOPHER VON KEITH COWAN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: April 9, 2018 |
| | ) | |

MANN, J. — Christopher Cowan appeals his convictions for first degree assault, first degree robbery, and second degree attempted murder for the robbery and stabbing of Michael Brenick. Cowan contends that (1) he was denied due process due to an impermissibly suggestive photomontage, (2) the trial court erred in admitting propensity evidence that he had a knife in his possession at the time of his arrest, (3) the pattern jury instruction defining a reasonable doubt is unconstitutional, (4) the prosecutor improperly shifted the burden of proof during rebuttal, (5) several prior out-of-state convictions were improperly included in his offender score, and (6) the trial court failed to determine whether his convictions for assault and robbery were the same conduct for purposes of his offender score.

We affirm Cowan's convictions. We remand for resentencing, however, because several of the prior out-of-state convictions were improperly included in Cowan's offender score and because the trial court failed to determine whether attempted murder and robbery were the same criminal conduct for the purpose of determining Cowan's offender score.

## FACTS

At approximately 11:40 p.m. on January 17, 2015, Domino's Pizza delivery driver Brenick left Domino's to make a delivery and found a man sitting in his car. The man wore a dark heavy winter coat and a backpack. Brenick grabbed the man by his coat, pulled him out of the car, and tried to hold him with one hand while he called the police with the other. Moments later, after he saw a folding knife with a four-inch blade, Brenick realized something was wrong—he reached down and felt his "intestines" sticking out of his stomach. As Brenick ran back to Domino's, he saw the man run into the Park Ballinger apartment complex behind Domino's. Brenick's coworkers called the police at 11:42 p.m. The police arrived minutes later and administered emergency aid to Brenick. Brenick was then transported to Harborview Medical Center. At the hospital, doctors found a chevron-shaped wound eight centimeters long above his belly button and a stab wound four inches long and four inches deep in his armpit.

Meanwhile, in the Park Ballinger apartment complex, Cale Stasiak was sitting on his apartment's stairwell when a man wearing a winter jacket and a backpack approached. The man moved uneasily at a "sluggish jog" and stopped just over an arm's length away from Stasiak. Stasiak saw him holding a manila envelope in one hand and a knife in the other. After the man knocked at the apartment across from

-2-

Stasiak's, he sat down next to Stasiak. He told Stasiak that "somebody had just tried to rob him for his weed," and asked if he could borrow Stasiak's cell phone to call a cab. Stasiak did not want to lend the man his phone so he called a cab for him. He called twice—once at 11:48 p.m. and again at 11:50 p.m.—but got no answer. By the second call, Stasiak walked away from the man so he could call his friend, and as he did so he saw the man take off his coat, empty its contents into the backpack, and lay the coat down on the stairwell. The man placed the manila envelope in an ashtray and set a scale down. Stasiak then turned his back to make the call. When he turned around again a minute later Stasiak saw the man running north out of the apartment complex. Moments after this, police officers, led by a police dog, appeared.

The canine unit tracked the suspect from the apartment complex, but lost the trail in the vicinity of a Circle K convenience store down the street. They collected the man's winter coat, scale, and manila envelope from the apartment's steps. The coat was gray with a red trim, and the manila envelope, which contained Brenick's car insurance documents, was torn. The police eventually found a fingerprint on the envelope that matched Cowan's left thumbprint.

After losing the suspect's trail, the police investigated the Circle K convenience store. The police learned the store clerk had served a customer around midnight. The clerk remembered that this customer told him he was unable to get a taxi and asked a young couple in the store for a ride.

The next morning, on January 18, another employee at the Circle K found a pawn slip with Cowan's name on it on the floor in front of the lottery-ticket machine. The

pawn slip was for a transaction on January 17, 2015, at the Cash America pawn shop on 170th Avenue and Aurora.

Edmonds Police Department Sergeant Robert Baker obtained three surveillance videos from Cash America. The first video, taken in the early afternoon on January 17, showed a man wearing a backpack and a very similar winter coat to the one that was recovered from Stasiak's apartment. The second video, taken on the evening of January 8, showed a man wearing a backpack over that same winter coat. The third video, taken a few days after the stabbing, on January 20, showed the same man with the same backpack but without the winter coat.

The police used the pawn slip and Cash America's surveillance videos to create a photomontage to show Brenick and Stasiak. They obtained Cowan's driver's license photo and five other photos of men who matched the description that Stasiak gave them: "a dark skinned black male, short hair, thin mustache."

On January 20, Sergeant Baker showed the photomontage to Stasiak, who positively identified Cowan. Per police instruction, Stasiak looked at the photos one at a time. He quickly identified Cowan. He was "positive" that his identification was correct: his confidence level was "ten" out of ten. Brenick, the victim, who was in the hospital under "a heavy load of drugs," could not identify Cowan.

Cowan was arrested on January 21, 2015. Cowan was charged with attempted first degree murder, first degree assault, and first degree robbery. Each count carried a deadly weapon enhancement.

A jury found Cowan guilty as charged for the assault and the robbery, however, on the attempted first degree murder charge, it found Cowan guilty of the lesser offense

of attempted second degree murder. The jury found that Cowan was armed with a deadly weapon during these crimes. Cowan appeals.

ANALYSIS

*Photomontage*

Cowan contends first that the photomontage was impermissibly suggestive and consequently that the trial court's denial of his motion to suppress, and subsequent in-court identification, denied his right to due process. We disagree.

We review a trial court's denial of a motion to suppress by determining whether substantial evidence supports the court's factual findings and whether those findings support the court's conclusions of law. Unchallenged findings are verities on appeal. State v. Ross, 106 Wn. App. 876, 880, 26 P.3d 298 (2001). Cowan does not challenge the trial court's findings. Consequently, we must determine whether those findings support the trial court's conclusions of law. We review conclusions of law de novo. Ross, 106 Wn. App. at 880.

An out-of-court photographic identification violates due process if it is so impermissibly suggestive as to give rise to a "substantial likelihood of irreparable misidentification." State v. Vickers, 148 Wn.2d 91, 118, 59 P.3d 58 (2002). The defendant must prove that the procedure was "impermissibly suggestive" to establish a violation. Vickers, 148 Wn.2d at 118. A suggestive identification procedure is one that "directs undue attention to a particular photo." State v. Eacret, 94 Wn. App. 282, 283, 971 P.2d 109 (1999). If the defendant proves that the procedure was suggestive, then this court determines whether, based on the totality of the circumstances, the procedure

-5-

created a substantial likelihood of irreparable misidentification. Vickers, 148 Wn.2d at 118.

Cowan argues that the photomontage was impermissibly suggestive in three ways. First, he argues that it was suggestive because Stasiak described the suspect as a "dark skinned black male," and out of the six people in the photomontage, Cowan had the darkest skin complexion. These facts, he argues, are similar to State v. Burrell 28 Wn. App. 606, 610-11, 625 P.2d 726 (1981). In Burrell, we held that a photomontage was suggestive when an eyewitness described the suspect as having a "frizzy Afro hairstyle" and the defendant's photograph was the only one that showed an Afro out of nine photos. The eyewitness was shown nine different photos, and while all of the individuals' skin colors were comparable, none of them closely resembled Burrell. Burrell, 28 Wn. App. at 610.

Burrell is distinguishable. Stasiak described the suspect as a "dark skinned black male, short hair, thin mustache." The photomontage given to Stasiak contained six photos of African American men with thin mustaches, short hair, and varying complexions. Cowan's photo shows darker skin, but this feature does not direct undue attention to his photo like a "frizzy Afro hairstyle" would when compared against eight different hairstyles. As the State points out, before Stasiak looked through the photomontage, he was informed that the photos "do not always show the true complexion of a person; it may be lighter or darker than shown." The trial court also recognized that Cowan's skin complexion was darker than his photo showed: "Cowan[,] who has been present at both days of this hearing[,] appears to me to be darker

complected [sic] than the photo that is in Exhibit 4. His skin color is more similar to the still photos that are reflected in Exhibit 6, 7 and 8."

Second, Cowan argues that his photo was one of two that showed teeth, the only one that showed a gap in the teeth, and the only one that showed teeth without gold dental crowns. Cowan relies on State v. Kinard, 109 Wn. App. 428, 431, 433-34, 36 P.3d 573 (2001), and State v. Traweek, 43 Wn. App. 99, 103, 715 P.2d 1148 (1986). The Kinard court held that a photomontage was impermissibly suggestive when the eyewitness described the suspect as a "large black man with gapped buckteeth" and only one of six photos showed a man with prominent gapped teeth. 109 Wn. App. at 431, 433-34. Similarly, the Traweek court held that an in-person lineup was suggestive when the eyewitness described the suspect as blond and Traweek was the only blond person in the lineup. 43 Wn. App. at 103.

This case is readily distinguishable from Kinard and Traweek. Here, Cowan's teeth do not direct undue attention to his photo. First, Stasiak described the suspect as a "dark skinned black male, short hair, thin mustache." Stasiak did not mention teeth. Stasiak only mentioned teeth after he identified Cowan, which distinguishes Kinard and Traweek, both cases in which the eyewitnesses gave the police the distinguishing feature that later singled out the defendants in either the lineup or the photomontage. As this court explained in Burrell, "when at least one witness'[s] description refers to a particular and somewhat distinctive characteristic . . . and the defendant's is the only photograph with such a characteristic, the risk that a misidentification will occur based solely or primarily upon that characteristic is substantially enhanced." 28 Wn. App. at 611.

Following the rational of Burrell, because Stasiak did not describe teeth as Cowan's distinguishing feature to the police before reviewing the photomontage, the risk of misidentification based on that feature was small. Second, the presence or absence of teeth in the photomontage is a minor difference that does little to distinguish the photos. In his photo, Cowan's lips are partially open and a gap in his teeth is apparent. The men's facial features, however, are apparent; all six men have similar facial features, skin complexions, eye colors, facial hair, and hairstyles. Cowan is correct that he is the only man with a gap in his teeth and without gold dental caps. But he is incorrect that, in light of the entire photomontage, this difference draws undue attention to his photo.

Third, Cowan argues that Sergeant Baker tainted Stasiak's in-court identification of Cowan when he confirmed that Stasiak picked the correct photo out of the photomontage. At trial, Stasiak testified that Baker confirmed his choice, but Baker testified that he did not. Cowan provides no evidence besides a defense expert's testimony at the suppression hearing for the proposition that confirming an eyewitness's identification after it was made taints any later in-court identification. We find this argument unpersuasive. The court made its ruling to admit the identification based on the evidence presented at the suppression hearing. At that hearing, Sergeant Baker testified that he did not confirm Stasiak's pick.

We conclude that Cowan's photo was not unduly suggestive and that the court did not abuse its discretion in denying Cowan's motion to suppress.

### Admission of the Knife

Cowan next contends that the trial court erred in admitting ER 404(b) evidence that he had a knife in his possession at the time of his arrest because there was no causal link between the knife and the crime. We disagree.

In his January 18, 2015 incident statement, and January 28, 2015 recorded interview with an Edmonds detective, Stasiak stated that the individual he encountered during the evening of January 17, 2015, was holding an open folding knife with a black or dark handle. Cowan was arrested on January 21, 2015. During a search incident to the arrest, the police recovered a black folding knife in Cowan's pocket. Cowan moved during pretrial to suppress evidence that he was in possession of a knife pursuant to ER 404(b). After argument, the trial court concluded:

> Here we have a knife found on the defendant three days after the crime that is a dark-handled folding knife. That knife essentially had no forensic evidence on it. It could have been cleaned. Maybe it wasn't the knife in question. But we do have two witnesses who say that the victim was stabbed with a dark-handled folding knife. That makes the testimony relevant. Unlike Hartzell, I think this is totally different. I'll deny [Cowan's motion to suppress].

At trial, Brenick testified that during his scuffle with his assailant he saw him holding a knife, "I see him holding the knife close to his body and I felt tired and I saw the knife and that's when I knew something was seriously wrong." Brenick testified that it was a "folding knife about four inches in length." Brenick could not remember the color of the knife. Consistent with his initial interviews, Stasiak also testified at trial that the person he encountered near his apartment was holding a folding knife. Stasiak did not testify to the size or color of the folding knife. Emergency room Dr. Hugh Foy testified that he treated Brenick and that Brenick's stab wounds were 3 to 4 inches

-9-

deep. However, after forensic testing, no blood was found on the knife recovered from Cowan incident to his arrest.

Cowan contends that evidence that he possessed a knife at the time of his arrest was improperly admitted because it was used to show he had the propensity to commit crimes with a knife. Cowan argues that the trial court abused its discretion by admitting the evidence which should have been excluded under ER 404(b). Washington's ER 404(b) provides:

> Evidence of other crime, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This court reviews decisions to admit evidence for abuse of discretion. State v. Luvene, 127 Wn.2d 690, 708, 903 P.2d 960 (1995). "A court abuses its discretion if it is exercised on untenable grounds or for untenable reasons." State v. Hartzell, 156 Wn. App. 918, 930, 237 P.3d 928 (2010).

ER 404(b) is not limited to bad or illegal acts, instead, the rule bars any acts used to show the character of a person to prove that the person acted in conformity with it on a particular occasion. State v. Everybodytalksabout, 145 Wn.2d 456, 466, 39 P.3d 294 (2002). Thus, while possession of a knife may be legal and thus not "bad" this does not mean that legal possession can be used to demonstrate propensity. Evidence of weapons entirely unrelated to the crime is inadmissible. State v. Jeffries, 105 Wn.2d 398, 412, 717 P.2d 722, cert. denied, 479 U.S. 922 (1986). But "if the jury could infer from the evidence that the weapon could have been used in the commission of the crime, then evidence regarding the possession of that weapon is admissible." Luvene,

127 Wn.2d at 708. Evidence used for this purpose need not meet the high standard of similarity required for "signature crimes." Hartzell, 156 Wn. App. at 932.

In Luvene, for example, it was sufficient to show that the defendant possessed a handgun of the same color and caliber as the one used in the crime. Luvene, 127 Wn.2d at 708. Similarly, in Hartzell, this court held that admitting evidence that the defendants owned guns did not violate ER 404(b) when the guns were offered to show that the defendants owned the guns that fired the bullets that were found at the scene, not to show that the defendants committed the crime in conformity with being gun users. 153 Wn. App. at 152. Cowan attempts to distinguish his case from Hartzell by arguing that the presence of a forensic link between the defendants' guns in Hartzell and the absence of a forensic link between the knife he was carrying and the knife used to stab Brenick is dispositive. That there was no forensic link here, he contends, means that the court violated ER 404(b) when it admitted evidence that he was carrying a knife when he was arrested because the knife's only relevance was propensity—that he was a knife-carrying person.

Cowan's contention fails. Here, the evidence was admissible because it was highly relevant. It was directly probative of the crime charged—a stabbing with a folding knife. At the suppression hearing, there were three key pieces of evidence before the court: (1) "two witnesses describe[d] a knife, dark handled, appeared to be a folding knife," (2) "[t]he defendant was found with a folding knife with a dark handle in his pocket three days after the stabbing," and (3) no forensic evidence was found on the knife recovered from Cowan. While the lack of forensic evidence is highly relevant, this goes to the weight of the evidence, not its admissibility. See State v. Duree, 52 Wn.2d

-11-

324, 328, 324 P.2d 1074 (1958) (hesitancy of witness to identify knife as the exact knife used by the defendant went only to the weight to be given the testimony and not to the issue of its admissibility). Because a jury could infer, based on the first two facts, that the knife Cowan was arrested with was used to stab Brenick, the trial court did not err in denying Cowan's motion to suppress the evidence. Luvene, 127 Wn.2d at 708.

Cowan places great weight on the failure of the State to elicit testimony at trial from either Brenick or Stasiak identifying the color of the folding knife. Cowan further emphasizes the State's seeming concession during its closing rebuttal argument that the knife in Cowan's possession may not have been the knife used in the stabbing:

> But the knife the police collected from the defendant on the 21st I would suggest is not the knife that was used on Michael Brenick. My suggestion is that like the coat that got shed, the knife that was actually used on Brenick got tossed. You don't want to have any evidence on you that is going to connect you directly to the assault.

Cowan's reliance on the trial testimony and closing argument fails for at least three reasons. First, while the witnesses at trial did not identify the color of the knife, both witnesses described a folding knife, and Brenick testified that it was approximately 4 inches long—which was consistent with the depth of the stab wounds described by Dr. Foy. While there was no blood found on Cowan's knife, this goes to the weight of the evidence; the jury could still infer that the 4-inch folding knife found in Cowan's possession was the knife used in the stabbing.

Second, while the State appeared to minimize the connection between the knife found in Cowan's possession and the knife used in the stabbing, this statement was

argument and, as the jury was instructed, argument is not evidence.[1] Jurors are presumed to follow the court's instructions. State v. Emery, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). Moreover, Cowan did not object, nor move for a mistrial after the State's rebuttal argument. The trial court is not obligated to declare a mistrial sua sponte.

Finally, even if the evidence was improperly admitted, any error was harmless. Erroneous admission of ER 404(b) evidence is not of constitutional magnitude and "requires reversal only if the error within reasonable probability, materially affected the outcome." Everybodytalksabout, 145 Wn.2d at 468-69. The error is harmless "if the evidence is of minor significance compared to the overall evidence as a whole." Everybodytalksabout, 145 Wn.2d at 468-69.

Here, the State's closing argument minimized the importance of the knife found in Cowan's possession by admitting that without forensic evidence it may not have been the knife used in the stabbing. In contrast, the remaining evidence was strong. Both Brenick and Stasiak identified Cowan from the photomontage. The police tracked the assailant to the Ballinger Park apartments where Stasiak testified that Cowan left behind his jacket and an envelope with Cowan's fingerprint on it that contained insurance papers belonging to Brenick. Given the strength of the State's case implicating Cowan, there is no reason to believe that the outcome would have been different if evidence of the knife found in Cowan's possession had been excluded.

The trial court did not abuse its discretion.

---

[1] See Clerk's Papers at 60-61 (jury instruction 1).

*Reasonable Doubt Instruction*

Cowan next argues that the jury instruction defining "a reasonable doubt" is unconstitutional. We disagree.

Jury instruction 5 defined a reasonable doubt as "one for which a reason exists and may arise from the evidence or lack of evidence." Jury instruction 5 was taken directly from WPIC 4.01.[2] Our Supreme Court has directed trial courts to use only WPIC 4.01 to instruct juries on reasonable doubt. State v. Bennett, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007).

Cowan attempts to circumvent Bennett by arguing that use of the language "a reason" in WPIC 4.01 undermines the presumption of innocence and the burden of proof because it requires the jury to articulate a reason for having reasonable doubt. We recently rejected this same argument in State v. Lizarraga, 191 Wn. App. 530, 567, 364 P.32 810 (2015); see also, State v. Parnel, 195 Wn. App. 325, 328-29, 381 P.3d 128, review denied, 186 Wn.2d 1031, 385 P.3d 107 (2016).

The trial court did not err in giving the required pattern jury instruction for defining reasonable doubt.

*Prosecutorial Misconduct*

Cowan next contends that he was denied his right to a fair trial because the prosecutor shifted the burden of proof during rebuttal closing argument. We disagree.

During rebuttal, the prosecutor addressed the defense counsel's failure to address Cowan's winter coat: "One thing I kept waiting for is an explanation for the coat.

---

[2] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01 (4th ed. 2016) (WPIC).

How do you counter that coat?" Cowan objected that the argument improperly shifted the burden of proof. The trial court overruled the objection, stating "It's not burden shifting." The prosecutor continued by pointing out that the winter coat was collected from the Ballinger Park apartments, arguing "You have multiple videos of the defendant wearing that coat prior to the assault."

In order to prevail on a claim for prosecutorial misconduct "the defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial." Emery, 174 Wn.2d at 756. Once the defendant demonstrates that a prosecutor's statements are improper, the standard for demonstrating prejudice depends on whether the defendant objected to the comments. Where, as here, the defendant objected, the defendant must show "that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." Emery, 174 Wn.2d at 760.

Cowan argues that the prosecutor's statement was misconduct because it shifted the burden of proof to him to present exculpatory evidence. Cowan relies primarily on State v. Cleveland, 58 Wn. App. 634, 647, 648-49, 794 P.2d 546 (1990) (finding misconduct but not a substantial likelihood that the misconduct affected the jury verdict). In Cleveland, we held that the prosecutor committed misconduct when he stated in rebuttal that "Mr. Cleveland was given a chance to present any and all evidence that he felt would help you decide. He has a good defense attorney, and you can bet your bottom dollar that Mr. Jones would not have overlooked any opportunity to present admissible, helpful evidence to you." 58 Wn. App. at 647.

But unlike Cleveland, the prosecutor did not suggest that Cowan should have presented evidence; rather, the prosecutor suggested that the evidence presented did

-15-

not support the defense's theory of the case. Rhetorically asking how the coat fit into the defense's theory of the case was not improper. A prosecutor can certainly "argue that the evidence does not support the defense theory." State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). The prosecutor here simply pointed out the discrepancy between Cowan's story and the evidence.

Because this was not misconduct, we do not address Cowan's argument regarding prejudice.

### Cumulative Error

Cowan contends that cumulative error deprived him of a right to a fair trial. He cites four errors whose combined effect constituted cumulative error: (1) the suggestive photomontage, (2) the admission of his knife, (3) the flawed WPIC 4.01 jury instruction on reasonable doubt, and (4) prosecutorial misconduct.

Under the cumulative-error doctrine a court may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant a right to a fair trial, even if each error standing alone would be harmless. But when "the errors are few and have little or no effect on the trial's outcome," the doctrine does not apply. State v. Venegas, 155 Wn. App. 507, 520, 228 P.3d 813 (2010). Here, there were not multiple and separate errors.

### Offender Score

The trial court counted 11 North Carolina convictions toward Cowan's Washington offender score: 8 convictions for breaking or entering, 1 conviction for attempted first degree burglary, 1 conviction for larceny, and 1 conviction for financial

card theft. Cowan next contends that his out-of-state convictions should not have been counted in his offender score. We agree in part.

Washington's Sentencing Reform Act's (SRA) standard sentencing ranges are calculated according to the seriousness of the crime and the defendant's offender score. RCW 9.94A.505, .510, .520, .525; State v. Olsen, 180 Wn.2d 468, 472, 325 P.3d 187 (2014). The offender score is the sum of points accrued as a result of prior convictions. RCW 9.94A.525. "Out-of-state convictions for offenses shall be classified according to the comparable offense definitions and sentences provided by Washington law." RCW 9.94A.525(3). If a foreign conviction is "comparable" to Washington offense, then it is included in the defendant's offender score. RCW 9.94A.525(3).

We review the trial court's calculation of a defendant's offender score de novo. Olsen, 180 Wn.2d at 472. The State bears the burden of proving the existence and comparability of the foreign conviction. Olsen, 180 Wn.2d at 472.

Analysis of the comparability of foreign convictions involves a two-part test that looks first at the legal comparability and second at the factual comparability:

> Under the legal prong, courts compare the elements of the out-of-state conviction to the relevant Washington crime. If the foreign conviction is identical to or narrower than the Washington statute and thus contains all the most serious elements of the Washington statute, then the foreign conviction counts towards the offender score as if it were the Washington offense. If, however, the foreign statute is broader than the Washington statute, the court moves on to the factual prong—determining whether the defendant's conduct would have violated the comparable Washington statute.

Olsen, 180 Wn.2d at 472-73 (internal citations omitted).

In applying the factual prong, we will "consider only facts that were admitted, stipulated to, or proved beyond a reasonable doubt." Olsen, 180 Wn.2d at 473-74.

The effect of a guilty plea is assessed under the law of the jurisdiction where the plea was entered. Olsen, 180 Wn.2d at 478-79 (assessing the effect of a plea to California conviction under California law). In North Carolina, when a defendant pleads guilty to the indictment, the defendant admits "all of the facts alleged in the indictment." State v. Thompson, 314 N.C. 618, 336 S.E.2d 78, 81 (1985).

A.      Breaking or Entering: 8 Counts

Breaking or entering in North Carolina is defined as "Any person who breaks or enters any building with intent to commit any felony or larceny. . . ." N.C. GEN. STAT. § 14-54(a). The most similar statute in Washington is second degree burglary, which requires that a person enter or remain unlawfully in a building "with intent to commit a crime against a person or property therein." RCW 9A.52.030(1) (emphasis added). Because, as the State concedes, a person could theoretically enter a building to commit a felony that was not against a person or property, breaking or entering under North Carolina law is broader than second degree burglary. Thus, under the legal prong, breaking or entering is not comparable to burglary.

Turning to the factual prong, the State further concedes that in five of Cowan's North Carolina convictions, the record does not establish findings or admissions concerning the nature of the felony. We accept the State's concession that those five convictions are not comparable under Washington law.

The State maintains, however, that three of the convictions for breaking and entering with the intent to commit larceny are factually comparable to second degree burglary in Washington. These are the crimes committed July 4, 2003, June 9, 2003, and November 8, 2008. We agree with the State.

All three indictments allege that Cowan broke and entered into a building with the intent to commit larceny. In North Carolina, "in felonious breaking or entering cases, as in burglary cases, 'when the indictment alleges an intent to commit a particular felony, the State must prove the particular felonious intent alleged.'" State v. Silas, 360 N.C. 377, 383, 627 S.E.2d 604, 608 (2006) (quoting State v. Wilkinson, 344 N.C. 198, 222, 474 S.E.2d 375, 388 (1996)). By pleading guilty to these charges, Cowan, therefore, admitted that he broke and entered with a specific intent—to commit larceny. This act, if done in Washington, would be factually comparable to second degree burglary. RCW 9A.52.030(1). The three convictions for breaking and entering with intent to commit larceny were properly counted toward Cowan's offender score.

B. Attempted First Degree Burglary: 1 Count

Cowan was convicted of attempted first degree burglary, based on his guilty plea to an indictment charging first degree burglary for a crime committed on September 14, 2004. Because North Carolina courts have not considered whether the requisite felony must be one against a person or property, the State concedes that the record does not establish that this crime was legally or factually comparable to a Washington attempted burglary. We accept the State's concession.

C. Larceny: 1 Count

Cowan was indicted and pleaded guilty in North Carolina for felonious breaking and entering and felonious larceny for stealing property worth $2,800.98 on September 30, 2004. Under North Carolina law, larceny is a felony without regard to the value of the property if the larceny was committed pursuant to the commission of a crime of breaking or entering a building. N.C. GEN. STAT. § 14-72(b)(2). Under Washington law

as it existed in 2004, theft of property worth more than $1500 was first degree theft.[3]
The State concedes that because the North Carolina theft statute is broader than
Washington's statute, the crimes are not legally comparable.

The State argues, however, that this crime is factually comparable to the 2004
first degree theft statute, former RCW 9A.56.030(1)(a), which stated that "A person is
guilty of theft in the first degree if he or she commits theft of [p]roperty or services which
exceed[s] one thousand five hundred dollars in value." We agree with the State.

In North Carolina when a defendant pleads guilty to larceny and the indictment
includes the value of the stolen property, that plea constitutes an admission of the value
of property stolen. State v. Hendricks, 138 N.C. App. 668, 531 S.E.2d 896, 899 (2000).
Cowan was indicted and pleaded guilty to breaking and entering and felonious larceny
for the stealing property worth $2800.98. Cowan's September 30, 2004, conviction for
felony larceny is factually comparable to first degree theft.

D.    Financial Card Theft

Finally, Cowan was convicted of financial transaction card theft in violation of
N.C. Gen. Stat. § 14-113.9.[4] We accept the State's concession that the North Carolina
crime is not legally comparable to any Washington crime and that the record does not
support that the crimes were factually comparable.

In summary, we accept the State's concession that 7 of the 11 convictions were
improperly included in Cowan's offender score. We find that three counts of breaking

_____

[3] Under current Washington law, theft of property worth more than $750 and less than $5000
would constitute second degree theft. RCW 9A.56.040(1)(a).
[4] This crime was committed on October 26, 2004.

and entering with intent to commit a larceny and one count of felony larceny were properly included in Cowan's offender score.

### Same Criminal Conduct

Cowan argues finally that his convictions for assault and robbery are the same criminal conduct for the basis of his offender score. Because the trial court did not address this issue, we remand for consideration.

When a person is sentenced for two or more current offenses, "the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score" unless the crimes involve the "same criminal conduct." RCW 9.94A.589(1)(a). "Same criminal conduct" means crimes that involved the same victim, were committed at the same time and place, and involved the same criminal intent. RCW 9.94A.589(1)(a).

A jury found Cowan guilty of first degree robbery, first degree assault, and second degree attempted murder. It also found that Cowan was armed with a deadly weapon during the commission of each crime. At sentencing, Cowan unsuccessfully argued for vacating the assault conviction as the lesser crime of attempted murder and asked the court to find that the robbery and the attempted murder charge were the same criminal conduct. The trial court vacated the attempted second degree murder charge in favor of the more serious first degree assault charge. The trial court did not, however, address whether the assault and the robbery were the same criminal conduct.

Whether two crimes constitute the same criminal conduct involves a determination of fact as well as the exercise of trial court discretion. State v. Nitsch, 100 Wn. App. 512, 519-20, 997 P.2d 1000 (2000). "A trial court abuses its discretion when it

-21-

fails to exercise its discretion, such as when it fails to make a necessary decision." State v. Stearman, 187 Wn. App. 257, 265, 348 P.3d 394 (2015). As we have previously explained, "Trial courts should make a finding on same criminal conduct at sentencing when requested to do so." State v. Salinas, 169 Wn. App. 210, 225, 279 P.2d 917 (2012) (remanding where the trial court failed to address defendant's request to treat three convictions for the same criminal conduct for sentencing purposes). On remand, the court should consider whether or not Cowan's convictions for assault and robbery are the same criminal conduct. The trial court should consider the question in light of State v. Chenoweth, 185 Wn.2d 218, 220, 370 P.3d 6 (2016).

*Statement of Additional Grounds*

Cowan raises two additional substantive issues in his pro se statement of additional grounds under RAP 10.10. He argues that his rights to confrontation and due process were violated by the State's expert's testimony at trial regarding the latent fingerprint left on the manila envelope, and that his right to due process was violated because the State withheld exculpatory evidence. These issues were not raised below.

An appellant may raise manifest errors that affect constitutional rights for the first time on appeal. RAP 2.5(a). An error is "manifest" if it actually prejudiced the defendant. To show actual prejudice, the appellant must make "a plausible showing" that the "asserted error had practical and identifiable consequences in the trial of the case." State v. O'Hara, 167 Wn.2d 91, 99, 217 P.3d 756 (2009) (internal quotation marks omitted). Courts analyzing actual prejudice focus on "whether the error is so obvious on the record that the error warrants appellate review." O'Hara, 167 Wn.2d at 99-100. "[T]o determine whether an error is practical and identifiable, the appellate

court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error." O'Hara, 167 Wn.2d at 100.

A.    Due Process and the Confrontation Clause

Cowan argues that his rights to confrontation and due process were violated by the State's expert's testimony at trial regarding the latent fingerprint left on the manila envelope. He contends that this right to due process was violated "when [the State's expert] was allowed to give her 'expert testimony' pertaining to her co-worker and supervisor, without them ever being cross-examined by Cowan's defense attorney." He argues that the admission of a lab report violated his confrontation clause rights. He also challenges the admission of the envelope at trial.

The State admitted exhibit 151 at trial. This exhibit was a brown bag that contained various paperwork and a small manila folder. Cowan did not object to the admission of exhibit 151.

The State called Stacey Redhead, a forensic scientist at the Washington State Patrol Crime Laboratory, to testify. Redhead testified that she performed a verification of a comparison examination that was done by the Edmonds Police Department at the request of the Edmonds Police Department. She testified that she received pictures of a latent thumbprint found on the manila envelope and Cowan's known thumbprint. She also testified that the normal process for examining a print required a review by her peer and then by her supervisor. At trial, Redhead compared enlarged pictures of Cowan's known thumbprint with the latent print found on the envelope. After doing so, she

testified that the latent print matched the known thumbprint. Cowan cross-examined her, but did not object to any of her testimony on direct examination.

Here, Cowan cannot show that either the admission of the envelope or Redhead's testimony was manifest error. First, there is no evidence that, as Cowan suggests in his SAG, the envelope was "clearly a replacement." Although an officer described the envelope at the scene as a "ripped up manila-type envelope," there was no evidence that the envelope in exhibit 151 was anything other than the envelope from the scene of the crime. Second, Redhead's testimony was not manifest error. She examined an enlarged latent print and an enlarged known print at trial and concluded that the latent print was made by the same person who made the fingerprint card. She confirmed that her verification of the Edmonds Police Department's verification was verified by a senior analyst and then by her supervisor. This was not manifest error.

B. Disclosure of Exculpatory Evidence

Cowan argues next that his right to due process was violated in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), because the State failed to disclose exculpatory evidence—the ripped-up manila envelope. Essentially, he claims that the manila envelope included in exhibit 151 was not the manila envelope from the scene.

Here, Cowan cannot establish manifest error. There is no evidence that the manila envelope included in exhibit 151 was anything other than the envelope from the scene of the crime.

No. 74402-0-I/25

We affirm Cowan's convictions, but remand for resentencing including a determination of whether attempted murder and robbery are the same criminal conduct.

_Mann, J._

WE CONCUR:

_Trickey, ACJ_                    _Leach, J._