[No. 44744. En Banc. December 29, 1977.]

THE STATE OF WASHINGTON, *Respondent,* v. KERMIT GEORGE HILLIARD, *Appellant.*

*Kermit George Hilliard,* pro se, *Smith, Kaplan, Withey, Ford & Theiler, Mary Alice Theiler,* and *Michael E. Withey,* for appellant.

*Christopher T. Bayley, Prosecuting Attorney,* and *H. Duane Evans, Deputy,* for respondent.

BRACHTENBACH, J.—Defendant appeals a second-degree assault conviction. Three issues are raised: (1) alleged lack of a *Miranda* warning; (2) alleged impermissible photographic identification procedure; (3) right to trial by impartial jury. We affirm.

The assault victim was a 17–year–old girl. Shortly after midnight, she had left her home and gone to a nearby telephone booth. While using the phone, she observed a car drive by two or three times. She recognized the driver as defendant Hilliard because she had met him on two prior occasions; she did not know his name.

Alarmed by the defendant's conduct, the victim decided to go home. On her way, she met the defendant who was now walking. He engaged her briefly in conversation. As the complainant started to enter her house, the defendant grabbed her. She screamed. The defendant stabbed her several times in the arm, then fled.

The police were called; the victim gave them a description of her assailant and the car he had been driving which was described as being a "tan station wagon, old." She described her assailant as "a Black male, late twenties, early thirties; approximately five foot nine or ten; light complected; beard and moustache; wearing a dark colored jacket and plaid hat, and possibly sunglasses."

A dog from the police canine unit was brought to the scene, and a track was attempted. The dog paid some attention to a white 1963 station wagon parked around the corner from complainant's home. Noting that the hood of the car was warm, an officer checked the license number which revealed that the car belonged to defendant Hilliard. Police records showed that Hilliard was a 32–year–old black male with light skin complexion and measuring 5 feet 9 inches in height.

The officers waited in the area to see if the assailant returned. Approximately 30 minutes later, an individual was observed coming around the corner about a block from the car. This individual was wearing dark clothing, but was not wearing a coat, hat or sunglasses. The police questioned him; he identified himself as Kermit Hilliard; an officer asked him if he was aware that his car was in the area, where he was coming from and where he was going.

Defendant stated that he did not know that his car was in the area because he had loaned it to a friend. But he

then turned in the direction of his vehicle and said, "That's my car." He also stated that he had just gotten off a bus and was on his way to visit a woman friend.

The officers testified that at that time they had not decided whether to arrest defendant; they were interested in his explanation for being in the area. However, the defendant was under such suspicion that he would not have been allowed to leave until he explained his presence.

The officers, with good reason, asked the defendant to supply the name and address or telephone number of his woman friend so that his story could be verified. He refused to supply that information, stating that the woman was married. The officers told defendant that they would discreetly check his story, *and that if his story checked out he would be allowed to go.* Defendant refused to supply the information. At this point, the officers decided to arrest him. He was placed under arrest for suspicion of assault, and informed of his *Miranda* rights.

In a pretrial hearing, defendant sought to suppress the statements made by him to the officers prior to being advised of his *Miranda* rights. The motion was denied and the officers testified. Defendant assigns as error that ruling.

In *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), the court held at page 444:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self–incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

(Footnote omitted.) The procedural safeguards required before a custodial interrogation may take place are the now familiar *Miranda* warnings.

The court did state that some police activities were not to be affected by the holding.

Our decision is not intended to hamper the traditional function of police officers in investigating crime. See *Escobedo* v. *Illinois,* 378 U. S. 478, 492. When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. *General on–the–scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact–finding process is not affected by our holding.* It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in–custody interrogation is not necessarily present.

(Footnote omitted. Italics ours.) *Miranda v. Arizona, supra* at 477–78.

The defendant argues that the questioning of him constituted a "custodial interrogation." To get to this point, defendant argues that once an officer has probable cause to believe that the person confronted has committed a crime, the questioning is custodial, relying on *State v. Creach,* 77 Wn.2d 194, 461 P.2d 329 (1969).

In *Creach,* the police were told that an individual was displaying credit cards that appeared to be stolen. An officer went to a hotel and Mr. Creach was pointed out as being the individual using the cards. The officer asked the defendant for identification, and was given a driver's license and credit cards bearing the name "Black" and told by defendant that his name was Black. Defendant was then asked questions concerning his date of birth, height, etc., and his responses did not correspond with the information on the license. He was then requested to accompany the officers to the police station. At this point, no *Miranda* warnings had been given.

The issue was whether the officer could testify concerning the statements of defendant. We held the testimony to be admissible because the questioning of defendant was during

the course of a routine investigation, not during a "custodial interrogation." In determining whether questioning in such encounters is custodial, we adopted the following rule:

> It is difficult to set forth an all–inclusive rule covering every possible situation, but once an investigating officer has probable cause to believe that the person confronted has committed an offense, the officer cannot be expected to permit the suspect to leave his presence. At that point, interrogation becomes custodial, and the suspect must be warned of his rights.

(Citations omitted.) *State v. Creach, supra* at 198.

■ We have stated that probable cause to arrest a person, without a warrant, arises when there is a reasonable ground for suspicion, supported by circumstances within the knowledge of the arresting officer to warrant a cautious person in believing that the accused was guilty of a crime. *State v. Parker,* 79 Wn.2d 326, 485 P.2d 60 (1971); *State v. Todd,* 78 Wn.2d 362, 474 P.2d 542 (1970).

Here, the victim had given the officers a general physical description of her assailant and his car. When the officers talked with defendant, they observed that, other than the fact that he was not wearing a coat and hat as described by the victim, he resembled the description given. Upon learning his name, the officers knew that he owned the car located nearby. But neither the defendant nor the car totally matched the description given to the officers. The defendant told the officers that his car was being used by a friend. And, defendant presented the officers with a plausible reason for his presence in the area and how he got there.

Possessing that information, the officers had grounds for suspicion and rightfully saw the need for further inquiry. But we cannot say that at that point they must have concluded that the defendant committed an assault. In fact, the officers informed defendant that if his explanation for his presence could be verified, he would be allowed to leave. This is not, as suggested by the defendant, an incident

where the officers had made a decision to make an arrest, but delayed doing so to avoid a *Miranda* warning.

The questioning of defendant was not a custodial interrogation. Mere suspicion, before the facts are reasonably developed, is not enough to turn the questioning into a custodial interrogation. *See Oregon v. Mathiason*, 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711 (1977) (per curiam). The court did not err in admitting the testimony of the officers.

■ The next issue relates to a photographic identification. Defendant's first contention is that his rights under the sixth amendment to the United States Constitution were violated because he was not afforded the presence of counsel at a post–arrest photographic identification. In *State v. Nettles*, 81 Wn.2d 205, 500 P.2d 752 (1972), we adopted the predominant view that counsel is not required at such a proceeding. That decision is still correct.

Defendant next contends that it was error to admit both the in–court and photographic identification made by the victim. We disagree.

The facts important to the photographic identification issue are as follows. While in custody, the defendant was advised by an officer that he would be in a lineup on the following Monday. The officer asked him to look for other persons in the jail of similar appearance. At this time, defendant had a moustache and a full beard.

On the day of the lineup, the officer noticed that the defendant had cut his hair and shaved off his moustache and beard. The men selected by the defendant to appear with him in the lineup had varying amounts of facial hair and one had a full beard similar to that worn by defendant at the time of his arrest. The defendant was the only clean–shaven person in the lineup. The prosecutor and police, realizing that defendant had altered his appearance, asked defendant's counsel for a suggestion as to how to proceed. He responded, "It's your ball game. You go ahead as you see fit." It was decided to hold the lineup with the persons

selected by the defendant and not to advise the complainant that there had been any changes in appearance.

Apparently confused by the fact that only one of the individuals had a beard, the complainant indicated that the bearded individual looked like her assailant, but after hearing the men speak, she stated the defendant sounded like her assailant.

Approximately 2 weeks later, an officer showed the complainant a display of six photographs. A picture of defendant, with a beard, was among these photographs. The person from the lineup whom the complainant had identified as most "looking like" her assailant was not among the photographs. The officer told the complainant that a man who had been in the lineup would be in the photographic display, but did not advise her that the person in question had shaved for the lineup. The victim immediately identified the photograph of the defendant as the man who had assaulted her.

At trial, the complainant and the officer were allowed to testify concerning the photographic identification, and the display was introduced. The complainant also made an in-court identification of the defendant.

Defendant's first argument is that it is impermissible to use a photographic identification when the defendant is in custody and available for a lineup. We do not agree.

In *State v. Nettles, supra,* the defendants were in custody but no lineup was held. Instead, a photographic identification was made. The issue was whether the photographic display was impermissibly suggestive; we stated in dicta that when a defendant is in custody, a lineup identification procedure would be a more effective, less questionable law enforcement technique and should be used.

But the Sixth Amendment does not prohibit the use of photographic identification under these facts. Numerous courts have held that photographic identification may be used despite the fact that the suspect is in custody. *See, e.g., United States v. Fowler,* 439 F.2d 133 (9th Cir. 1971)

(dicta); *State v. Anderson,* 211 Kan. 148, 505 P.2d 691 (1973); *Stevenson v. State,* 244 So. 2d 30 (Miss. 1971); *McClain v. State,* 247 Ark. 33, 444 S.W.2d 99 (1969).

We note that some courts limit the use of photographic identification when the suspect is in custody. These courts require the existence of some extenuating circumstances before such procedure may be used. *People v. Williams,* 60 Ill. 2d 1, 322 N.E.2d 819 (1975); *People v. Anderson,* 389 Mich. 155, 205 N.W.2d 461 (1973).

■ It is not necessary to decide whether we will so limit the use of photographic identification because this defendant created his own extenuating circumstances. His blatant attempt to thwart the lineup identification presented the prosecution with a dilemma. His lawyer did nothing to help. Despite this fact, the police conducted the lineup, without advising the complainant that the suspect had changed his appearance. The lineup resulted in a partially successful identification. In light of this situation, it was not improper for the police to subsequently present a photographic display using a picture of defendant which represented him as he appeared on the night of the assault.

The next argument is that the identification procedure used in this case was impermissibly suggestive, therefore evidence concerning it should have been suppressed.

■ A photographic identification procedure may not be impermissibly suggestive. The test is set forth in *Simmons v. United States,* 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968):

> [E]ach case must be considered on its own facts, and . . . convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*See Manson v. Brathwaite,* 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977).

In *Simmons,* the court noted several factors which may cause witnesses to err in identifying criminals from photos. These factors are (1) witness had only a glimpse of the criminal at the time of the incident, (2) the only photo in the array resembling the criminal was that of defendant, (3) one picture is emphasized and (4) the witness is told that the police have other evidence that one of the persons pictured committed the crime. The harm which such procedures may cause is that once the witness makes a misidentification, he is thereafter apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent courtroom identification.

We do not find the identification procedure used here to have been impermissibly suggestive. The only claims made by defendant that merit comment are that (1) during the identification the officer stated that one of the individuals depicted had been in the lineup and (2) the display did not contain a picture of the individual identified by the complainant as looking like her assailant.

Concerning the first point, it would only be common sense to know that the suspect would be in both the lineup and photographic display. The comment by the officer added nothing to this knowledge and in no way detracted from the objectivity of the identification procedure. As to the second objection, it might have been best to have included a picture of the person previously identified. But, in this case, the failure to do so simply cast doubt on the lineup identification. It did not point an accusing finger at the defendant's picture. The procedures employed were not so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. The final contention is that because the photographic identification was impermissibly suggestive, the in–court identification should have been suppressed. First, the photographic identification was not improper. Second, even if the photographic identification procedure was questionable, the in–court identification is proper if it has an independent origin. *See United States*

*v. Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967) (dealing with lineup identification). Here, the witness recognized the defendant prior to the assault and spent several minutes talking with him. The victim had ridden with the defendant for 30 to 45 minutes a few months earlier and was with him on another occasion for about 5 minutes. These factors lead us to conclude that the in–court identification had an independent origin and was properly admitted.

The final issue concerns the jury selection procedures used by King County. The defendant contends that his constitutional right to be tried by an impartial jury has been violated. Specifically, defendant argues that there is an unconstitutional exclusion of racial minorities from jury service resulting from the exclusive use of voter registration lists in selecting jury panels. We disagree.

■ By virtue of the sixth and fourteenth amendments to the United States Constitution, a criminal defendant has a right to be tried by a jury that is representative of the community. *Taylor v. Louisiana,* 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692 (1975); *Smith v. Texas,* 311 U.S. 128, 85 L. Ed. 84, 61 S. Ct. 164 (1940). For an excellent analysis of the decisional law on the subject matter, see the appendix in *Foster v. Sparks,* 506 F.2d 805, 823 (5th Cir. 1975) (Honorable Walter P. Gewin, *An Analysis of Jury Selection Decisions*). But, as defendant concedes, the burden of proving that a selection system is constitutionally invalid is upon the challenger. *Smith v. Texas, supra.*

The states have wide discretion in selecting the proper source of jury lists. What is required is that the source from which juries are selected "reasonably reflects a cross–section of the population". *Taylor v. Louisiana, supra* at 528; *Brown v. Allen,* 344 U.S. 443, 97 L. Ed. 469, 73 S. Ct. 397 (1953).

Jurors in Washington are selected at random from voter registration lists pursuant to RCW 2.36.060. The use of voter registration lists has been consistently upheld as the

best source of compiling a fair cross section of the community. *E.g., Simmons v. United States,* 406 F.2d 456 (5th Cir. 1969), *cert. denied,* 395 U.S. 982, *rehearing denied,* 396 U.S. 871 (1969). *See* discussion in *Foster v. Sparks, supra* at 815–19 (appendix); Krause, *Jury Selection—Sixth Amendment Right to a Fair Cross Section of the Community—A Change in Emphasis,* 41 Mo. L. Rev. 446, 452 (1976). The defendant offered no evidence concerning the representation of racial minorities on King County voter registration lists. Thus, there is a total lack of proof that these lists do not constitute a fair cross section of the community and that their use is inherently unconstitutional.

Even if the source list is not in itself unconstitutionally discriminatory, a selection procedure is still invalid if it systematically excludes a cognizable class of individuals. *Taylor v. Louisiana, supra.* What is meant by "systematic exclusion" has been variously argued by writers. *Compare Foster v. Sparks, supra* at 821–23 *with* Krause, *supra.* The State argues that one challenging a selection procedure must prove that there was an intent to discriminate. We disagree.

We believe the correct test concerning "intent" is set forth in *Carmical v. Craven,* 457 F.2d 582, 587–88 (9th Cir. 1971), *cert. denied,* 409 U.S. 929 (1972):

> The object of the constitutional mandate is to produce master jury panels from which identifiable community classes have not been systematically excluded. The object is neither to reward jury commissioners with good motives nor to punish those with bad intentions. When a jury selection system actually results in master jury panels from which identifiable classes are grossly excluded, the subjective intent of those who develop and enforce the system is immaterial. . . .
>
> However, proof of deliberate intent to discriminate may be relevant when, as in *Swain [Swain v. Alabama,* 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824 (1965)], the percentage of excluded classes is not gross enough unequivocally to establish discrimination. Evidence that the system was designed to discriminate invidiously may add enough strength to such statistical data to make out

a prima facie case. In short, subjective intent may be relevant to prove that a particular system is invidiously discriminatory, but that evidence is not an element of the constitutional test.

A challenger need not show bad faith. Ignorance of the selection procedure is as constitutionally impermissible as knowledge of such inadequacy and unwillingness to rectify it. *Foster v. Sparks, supra* at 823 (appendix). *Accord, United States v. Armsbury,* 408 F. Supp. 1130, 1140 (D. Ore. 1976).

But a defendant is not entitled to exact cross–representation in the jury pool, nor need the jury selected for his trial be of any particular composition. *Taylor v. Louisiana, supra; Swain v. Alabama,* 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824 (1965).

The evidence adduced at trial showed the following. The State presented a study done in a 4–month period of 1974. This study showed that racial minorities were represented in King County jury pools equal to or above their representation in the population. The evidence relied on by defendant shows that while racial minorities represent approximately 10 percent of the county population, they represented less than 4 percent of the jury pool presiding at the time of his trial.

This evidence does not show a violation of defendant's constitutional rights. First, there is no precedent allowing a grouping of all racial minorities in determining the discriminatory impact.

Second, the identifiable groups were not significantly underrepresented in the jury pool. The largest disparity was in the Black population, who represented only 1.3 percent of the jury pool. Blacks constitute approximately 4 percent of the county population. Office of Program Planning & Fiscal Management, Population Studies Division, *Population Trends of 1976, State of Washington,* Table 6, p. 22 (1976). The disparity between population and jury representation is 2.7 percentage points. This is not a constitutionally significant disparity. *See Simmons v. United*

*States, supra* (4.7 disparity not significant); *Foster v. Sparks, supra* at 828–29.

The defendant was not denied his constitutional right to trial by an impartial jury constituting a fair cross section of the community.

The defendant has raised several other issues. We have reviewed them and find them to be without merit.

The conviction is affirmed.

WRIGHT, C.J., and ROSELLINI, HAMILTON, STAFFORD, UTTER, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.

Petition for rehearing denied January 31, 1978.