[No. 8171–3–I.   Division One.   March 16, 1981.]

THE STATE OF WASHINGTON, *Respondent,* v. AUDREY
KELLY BURRELL, *Appellant.*

*William Jaquette,* for appellant (appointed counsel for appeal).

*Norm Maleng, Prosecuting Attorney,* and *Dennis Nollette, Deputy,* for respondent.

JAMES, C.J.—Audrey K. Burrell appeals his conviction of second degree assault. He alleges that improper police identification procedures tainted eyewitness identifications and denied him due process of law. We affirm.

On the night of July 14, 1979, David Warfield was in the Pioneer Square district of Seattle. The area was well lighted by both street lights and lights from nearby buildings. Warfield testified that while he was watching a fight, "someone grabbed me in my butt." Warfield turned around and pushed a man away from him. The man was about 5 inches away from Warfield at this time. The man came back at Warfield swinging "with something like with a closed fist," which cut through Warfield's shirt and into his forearm. Then he ran off and Warfield, who was not yet aware he had been badly cut, pursued and caught his assailant after a 1–block chase. Warfield testified, "I grabbed his shoulder and he turned around real quick, and I thought he had the knife again, so I was really scared and I ran back down the hill." Warfield recalled nothing else until he was talking to police officers while aid units were tending the cuts.

Warfield told police that he thought his assailant was a male, Hawaiian or black, about 25 to 28 years old, with a stocky build and brown hair. He said the man was wearing a dark blue or black pinstriped type of overall with legs cut off or folded up to look like shorts. An eyewitness to the attack gave police a substantially identical description of the assailant and also mentioned that the man had an "Afro" hairstyle and was carrying a shoulder bag.

Warfield first saw his assailant some 5 minutes before the attack. The eyewitness had also observed him about 5 minutes before the attack, dancing by himself on the sidewalk. He saw the assailant stop dancing and walk over to Warfield, then saw Warfield push him away and the assailant strike back. Acting on Warfield's and the witness' descrip-

tions, the police arrested Burrell that night less than 5 blocks from the scene of the attack.

Police scheduled an in–person lineup for July 18 and requested suitable persons from the King County jail for the lineup. When police detectives went to the jail to bring in the line, they discovered there were only two individuals in the jail whose appearances were roughly comparable to that of Burrell.

Police then put together a photograph montage of nine different photos. Detectives laid the photos out for Warfield when he came in to make the identification. He set Burrell's picture aside and, after looking at all the pictures, identified Burrell as his assailant. After the identification, the detective told Warfield his identification was "right," but he made no other comment. Detectives gave the eyewitness a stack containing the photographs previously shown to Warfield. The witness selected Burrell's photo before he had looked at all of the pictures and then confirmed his choice after looking at the others. He asked the detective if he had chosen the "right one," and the detective said "yeah."

At a pretrial hearing, Burrell moved to suppress the photo identification and bar an in–court identification by Warfield and the eyewitness. Concluding that the identification procedures were not impermissibly suggestive, the trial judge denied the motions. Burrell then proceeded to trial before a jury which convicted him of second degree assault.

Burrell contends that the identification procedure employed denied him due process of law, relying on our decision in *State v. Thorkelson* 25 Wn. App. 615, 611 P.2d 1278, *review denied,* 94 Wn.2d 1001 (1980). *Thorkelson* was a case of armed robbery in which each of the four witnesses had only a "fleeting glimpse" of the robber. *Thorkelson,* at 619. A photo montage identification procedure was used in which only two of the four witnesses were able to make even tentative identifications of Thorkelson. Three witnesses did identify Thorkelson in a subsequent lineup.

However, the danger that witnesses recognize suspects based on the photographs shown rather than their original perception and recollection of the suspect's appearance is well known. *State v. Hilliard,* 89 Wn.2d 430, 573 P.2d 22 (1977).

Our opinion notes both our Supreme Court's expressions of disapproval of photographic identification procedures, *State v. Nettles,* 81 Wn.2d 205, 500 P.2d 752 (1972); *State v. Hilliard, supra,* and the rather widespread use of such procedures despite the Supreme Court's disapproval. *State v. Thorkelson, supra.* In *Thorkelson* at page 619, we stated:

> In view of the disregard for our Supreme Court's long-standing disapproval of such practices, we conclude [this] identification evidence . . . should have been suppressed. We hold that, absent extenuating circumstances, photographic identification procedures of an in–custody defendant should not be used.

We then held that the identification evidence should have been suppressed.

■ The purpose of placing some restriction upon police identification procedures is to prevent misidentification of suspects by witnesses. *Neil v. Biggers,* 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972). The lineup is favored because it is generally considered more reliable and as involving less risk of prejudice and misidentification. *State v. Nettles, supra.* The identifications in *Thorkelson* were patently unreliable because the witnesses, who had little opportunity to observe the robber, were subjected to a photo identification procedure whose effect was almost certain to leave them with a recollection of the suspect based on Thorkelson's photograph rather than their original impressions. The denial of due process stemmed not merely from use of a photo montage, but from use of an identification procedure almost calculated to create a serious risk of misidentification.

Identification evidence should be suppressed only where consistent with the purpose of such restrictions, namely, preventing misidentification of suspects by witnesses.

*Thorkelson* creates a rule of exclusion somewhat broader in scope than is consistent with this purpose. But the procedure by which identification evidence is obtained is not so determinative of its reliability that a per se rule of exclusion for photographic identifications is appropriate. Insofar as *Thorkelson* may suggest a per se rule of exclusion, we modify its holding.

██ ██ A photographic identification procedure violates due process if, under the totality of circumstances, the procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *State v. Hilliard, supra* at 438, quoting *Simmons v. United States,* 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968); *Manson v. Brathwaite,* 432 U.S. 98, 116, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977). Where the identification procedure is suggestive, "the corrupting effect of the suggestive identification itself" must be weighed against other factors probative of the reliability of the witness' identification. *Manson v. Brathwaite, supra* at 114. These factors, which are related to the witness' susceptibility to suggestion, include his opportunity to view the criminal at the time of the crime, his degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the identification, and the time between the crime and the identification. *Manson v. Brathwaite, supra; Neil v. Biggers, supra.* Here, police conduct in the course of the identification procedure was not suggestive.

Burrell further contends that the photographs themselves are suggestive. We agree that the photo montage is not free of suggestive potential. Among the nine individuals included in the montage, there are persons having particular features similar to Burrell's. Skin color is comparable in most of the photos. Of the nine, however, none of the individuals closely resembles Burrell. Burrell's photo is a closer view than the others, which might have tended to call attention to his photo. None of the other individuals had a "frizzy Afro" hairstyle as long as Burrell's.

The only persons who can know which characteristics,

individually and as a whole, are determinative of their identifications are the witnesses themselves and they may not be able to articulate precisely the basis of their decision. However, when at least one witness' description refers to a particular and somewhat distinctive characteristic (here, the "frizzy Afro" hairstyle) and the defendant's is the only photograph with such a characteristic, the risk that a misidentification will occur based solely or primarily upon that characteristic is substantially enhanced.

On balance, the photos are sufficiently suggestive to require our consideration of whether there are countervailing indicia of witness reliability. We are satisfied that such indicia exist.

Both witnesses had adequate opportunity to observe and were paying sufficient attention to unfolding events so as to make a reliable identification. Both witnesses saw the attack, which occurred in a well lighted area. Both first noticed Burrell some 5 minutes before the attack. The eyewitness observed Burrell from the time he stopped dancing through the altercation with Warfield. Warfield had two especially close encounters with his assailant.

Both gave accurate descriptions. They described the assailant to police that night, and their descriptions enabled officers to arrest Burrell the same night a few blocks away. The descriptions coincide with Burrell's photograph.

Both were certain they had identified the correct person; indeed, both set Burrell's photo aside while examining the photos and before seeing all of them. Finally, the identification occurred only 4 days after the attack.

Finding sufficient indicia of witness reliability, we conclude that the identification procedure was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *State v. Hilliard, supra* at 438.

The judgment is affirmed.

DURHAM, J., concurs.

RINGOLD, J. (concurring in the result)—I read the majority opinion to hold that the violation of the rule in *State v. Thorkelson,* 25 Wn. App. 615, 611 P.2d 1278 (1980), here was harmless in light of the strong indicia of reliable identifications. *Manson v. Brathwaite,* 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977); *State v. Hilliard,* 89 Wn.2d 430, 573 P.2d 22 (1977).

The rule in *Thorkelson* is a salutary one that reduces the risk of misidentification. The majority's purported modification of *Thorkelson* is dicta unnecessary to the decision. The law in this jurisdiction remains that absent extenuating circumstances, a photographic identification procedure should not be used when the defendant is in custody. A violation of this rule requires balancing the inherently corruptive effect of the photo montage and any other suggestiveness against the countervailing indicia of reliability. *Manson v. Brathwaite, supra; State v. Hilliard, supra.* Even if the evidence of the photo montage procedure and identification should have been suppressed, I find sufficient indicia of reliability to concur in the conclusion that the in-court identifications were admissible at trial. Any error in the admission of the photo montage identification was harmless.