IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 35314-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DANIEL HERBERT DUNBAR, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — Daniel Dunbar appeals after a jury found him guilty

of possession of a stolen motor vehicle. Mr. Dunbar raises three issues along with a

*Ramirez*[1] motion. First, he argues the trial court impermissibly admitted his pre-*Miranda*[2]

incriminating statements. Second, he argues that when the to-convict jury instruction

included the definitional phrases of possession of a stolen motor vehicle, the phrases

became the law of the case and the State failed to prove each beyond a reasonable doubt.

---

[1] *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018).

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Third, he argues the trial court abused its discretion when it ordered him to pay $10 per month toward his legal financial obligations (LFOs) while incarcerated. We affirm, but remand to strike certain LFOs.

FACTS

Deputy James Wang responded to a call from Gary Quincy, who reported that he had just seen his son's stolen pickup truck. Mr. Quincy took a picture of the driver, and because he noticed the pickup truck's license plate had been changed, he took a picture of that, too. When Deputy Wang met Mr. Quincy, Mr. Quincy told him the license plate number and showed the deputy a picture of the driver.

Deputy Wang ran the license plate and learned that it was not associated with a stolen vehicle. He then went to the address associated with the license plate. The resident at the address advised Deputy Wang that the truck in question was parked at 10522 East 4th Avenue.

Once at the second address, Deputy Wang noticed a pickup truck that matched the description of the stolen truck. He ran the truck's vehicle identification number and learned that it was registered to Mr. Quincy's son, Keith Quincy. Deputy Wang noticed that one of the windows was broken and the ignition was dismantled so it could be turned without a key.

At this point, Mr. Dunbar emerged from the residence at 10522 East 4th Avenue and hollered at the deputy. The deputy recognized Mr. Dunbar from the photograph shown to him by Gary Quincy.

The deputy asked Mr. Dunbar to sit down on the porch steps. Mr. Dunbar answered several of the deputy's questions. Mr. Dunbar admitted that he recently drove the truck and claimed to have purchased it from an Alex Randu. Mr. Dunbar also attempted to explain the recent absence of the truck's license plate, the broken window, and the removed ignition. Deputy Wang then spoke to other people at the residence. When their answers did not match Mr. Dunbar's, and when Deputy Wang could not find information about an Alex Randu, the deputy handcuffed Mr. Dunbar, placed him in his patrol car, and advised him of his *Miranda* rights.

The State charged Mr. Dunbar with possession of a stolen motor vehicle.

Mr. Dunbar filed a CrR 3.5 motion, challenging the admissibility of his pre-*Miranda* statements. At the CrR 3.5 hearing, the State called Deputy Wang. The deputy testified to the facts set forth above. He also testified that had Mr. Dunbar refused to talk to him and tried to walk away, he would have stopped him and put him in handcuffs. He further testified that there was a second officer with him when he began to question Mr. Dunbar, and a third officer arrived soon after.

3

The trial court found that Deputy Wang's questions constituted an interrogation, but that Mr. Dunbar was not in custody. The trial court therefore denied Mr. Dunbar's request to suppress his statements.

The court empaneled a jury, and the parties presented their evidence. At the end of trial, the court read its instructions of the law to the jury, including the standard to-convict instruction for possession of a stolen motor vehicle. The parties gave their closing arguments, and the jury then deliberated and returned a guilty verdict.

At sentencing, the trial court ordered Mr. Dunbar to begin payment on his LFOs one year into his incarceration, at a rate of $10 per month.

Mr. Dunbar timely appealed.

## ANALYSIS

A.    CUSTODIAL INTERROGATION

Mr. Dunbar challenges the trial court's conclusion that the pre-*Miranda* interrogation was not custodial.

The Fifth Amendment to the United States Constitution protects against self-incrimination, among other things. To protect against compelled confessions, *Miranda* warnings are required when a defendant is in custody and subject to interrogation. *Miranda*, 384 U.S. at 444; *see also State v. Post*, 118 Wn.2d 596, 605, 826 P.2d 172, 837

4

P.2d 599 (1992) ("The *Miranda* exception applies when the interview or examination is (1) custodial (2) interrogation (3) by a state agent."). The State concedes and does not challenge that Mr. Dunbar was subject to interrogation by a state agent. *See* Resp't's Br. at 10 n.8. Therefore, the only issue on appeal is whether Mr. Dunbar was in custody.

"'[C]ustodial' refers to whether the defendant's freedom of movement was restricted at the time of questioning." *Post*, 118 Wn.2d at 605-06. Washington has adopted the *Berkemer*[3] test, an objective approach that determines, "whether a reasonable person in a suspect's position would have felt that his or her freedom was curtailed to the degree associated with a formal arrest." *State v. Heritage*, 152 Wn.2d 210, 218, 95 P.3d 345 (2004) (citing *Berkemer*, 468 U.S. at 441-42). *Berkemer* also held that a routine *Terry*[4] stop or other similar traffic stop did not rise to the level of "custody" for purposes of *Miranda* warnings. *Berkemer*, 468 U.S. at 439-40. Washington courts have agreed *Terry* stops are not custodial under *Miranda*. *State v. Hilliard*, 89 Wn.2d 430, 432, 435-36, 573 P.2d 22 (1977); *Heritage*, 152 Wn.2d at 218.

In *Heritage*, two bicycle security officers noticed four juveniles sitting together, smoking what appeared to be a marijuana pipe. 152 Wn.2d at 212. The officers told the

---

[3] *Berkemer v. McCarty*, 468 U.S. 420, 441-42, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).
[4] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

juveniles that they needed to ask them some questions and then they would be on their way. *Id.* at 213. The officers asked one of the juveniles whether the marijuana pipe belonged to him. *Id.* When the juvenile denied ownership, the officers addressed the entire group and stated, "'Whose marijuana pipe is it?'" and "'We're Park Security, let's move it along.'" *Id.* The defendant responded, "'It's my pipe.'" *Id.* The security officers called Spokane police, and the police arrested the defendant. *Id.* After her arrest, the defendant moved to suppress her statement that she owned the marijuana pipe. *Id.* The trial court denied the motion, concluding that the security officers were not agents of the State, and that the defendant was not in custody. *Id.*

The Supreme Court concluded that the security officers were agents of the State and then analyzed whether the defendant was in custody at the time she was interrogated. *Id.* at 216-17. In its analysis of the second issue, the Supreme Court reasoned: "An officer making a *Terry* stop may ask a moderate number of questions to determine the identity of the suspect and to confirm or dispel the officer's suspicions without rendering the suspect in 'custody' for the purposes of *Miranda*." *Id.* at 219 (citing *Berkemer*, 468 U.S. at 439-40). The officers asked to whom the marijuana pipe belonged in order to confirm or dispel suspicions about the juveniles smoking marijuana. *Id.* "A reasonable

person in [the defendant's] position would not have believed her freedom was curtailed to a degree analogous to arrest." *Id.*

Here, like *Heritage*, an officer, in the presence of another officer, asked questions to confirm or dispel the officer's suspicions whether the defendant was engaged in criminal activity. Mr. Dunbar voluntarily came out of the residence and hollered at the officers. He also agreed to sit on the porch steps when asked by Officer Wang. He then answered a series of questions designed to confirm or dispel Officer Wang's suspicions that Mr. Dunbar drove the pickup truck knowing it to be stolen. Under the objective evidence test, a reasonable person in Mr. Dunbar's position would not have believed his freedom was curtailed analogous to an arrest.

Mr. Dunbar emphasizes Officer Wang's testimony during the CrR 3.5 hearing, that he would have stopped and handcuffed Mr. Dunbar if he tried to leave. But Officer Wang did not express this thought to Mr. Dunbar. Officer Wang's unexpressed thought is irrelevant to an objective test analysis. We conclude the trial court did not err in when it determined that Mr. Dunbar's statements were not custodial and when it denied his CrR 3.5 motion.

B.      SUFFICIENCY OF THE EVIDENCE

Mr. Dunbar contends the to-convict instruction required the State to prove that he

concealed or disposed of the pickup truck and because there was no evidence of this, his

conviction must be reversed.  Here, the to-convict instruction provided in relevant part:

> To convict the defendant of the crime of possessing a stolen motor
> vehicle, each of the following elements must be proved beyond a reasonable
> doubt:
> (1) That on or about June 10, 2016, the defendant . . . knowingly
> received, retained, possessed, concealed, or disposed of a stolen motor
> vehicle.

Clerk's Papers (CP) at 37.  The phrase, "knowingly received, retained, possessed,

concealed, or disposed of" is part of the definitional phrase of how one commits

possession of stolen property.  RCW 9A.56.140(1).

Mr. Dunbar relies on *State v. Lillard*[5] and *State v. Hayes*[6] to further his argument

that when definitional terms are included in the jury instructions, those terms become the

law of the case and must be proved beyond a reasonable doubt.  The State responds and

relies on the holding in *State v. Makekau* that the inclusion of the definitional terms of

possession of a stolen motor vehicle in the jury instructions did not turn them into

alternative means, requiring proof of each one.  194 Wn. App. 407, 409-10, 378 P.3d 577

---

[5] 122 Wn. App. 422, 93 P.3d 969 (2004).

[6] 164 Wn. App. 459, 262 P.3d 538 (2011).

(2016).  The Supreme Court recently resolved this split in *State v. Tyler*, 191 Wn.2d 205,

422 P.3d 436 (2018).

In *Tyler*, the defendant was charged with one count of possession of a stolen motor

vehicle.  *Id.* at 209.  At trial, the to-convict jury instruction read in part,

> To convict the defendant of the crime of possessing a stolen motor vehicle,
> each of the following elements of the crime must be proved beyond a
> reasonable doubt: (1) [t]hat on or about the 10th day of January, 2014, the
> defendant knowingly received, retained, possessed, concealed, disposed of a
> stolen motor vehicle.

*Id.*  The defendant appealed, arguing the inclusion of the definitional phrases in the to-

convict jury instruction required the State to prove all terms to the jury.  *Id.* at 211.  The

Supreme Court disagreed.

The court recognized that possession of stolen property is a single means crime.

*Id.* at 212.  Furthermore, the description of the many ways one may possess stolen

property is merely definitional.  *Id.*  The court found the Court of Appeals' reasoning in

*Makekau* to be persuasive.  *Id.* at 213-14.  "'[T]he only purpose of RCW 9A.56.140(1) is

definitional—to provide a better understanding of the single element stated in

RCW 9A.56.068(1).'"  *Id.* at 213 (quoting *Makekau*, 194 Wn. App. at 414).  "'[T]he five

terms in RCW 9A.56.140(1) are so closely related that they do not describe distinct acts

apart from actually possessing the stolen vehicle, but are merely facets of the same

criminal conduct.'" *Id.* at 213-14 (internal quotation marks and citation omitted) (quoting *Makekau*, 194 Wn. App. at 414). Therefore, the inclusion of definitional phrases in the to-convict instruction did not create alternative means. *Id.* at 214.

*Tyler* controls the outcome here. Mr. Dunbar's to-convict instruction incorporated the definitional phrase of possession of a stolen motor vehicle. But this did not require the State to prove that Mr. Dunbar concealed or disposed of the pickup truck.

C.      LFOs

Mr. Dunbar argues the trial court abused its discretion by ordering him to pay $10 per month toward his LFOs beginning one year into his 57 month sentence. Mr. Dunbar, however, did not object to this payment plan.

We generally decline to review claim of errors raised for the first time on review. RAP 2.5(a). Although three exceptions permit review of unpreserved claims of error, Mr. Dunbar does not argue which, if any, of the exceptions apply. We therefore decline to review this claim of error.

D.      *RAMIREZ* MOTION

Mr. Dunbar filed a motion to permit a supplemental assignment of error. He argues, pursuant to *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018), we should

instruct the trial court to strike the $200 criminal filing fee and the $100 deoxyribonucleic (DNA) collection fee. We grant his motion and consider this additional issue.

House Bill 1783, which became effective June 7, 2018, prohibits trial courts from imposing discretionary LFOs on defendants who are indigent at the time of sentencing. LAWS OF 2018, ch. 269, § 6(3); *Ramirez*, 191 Wn.2d at 746. This change to the criminal filing fee statute is now codified in RCW 36.18.020(2)(h). As held in *Ramirez*, these changes to the criminal filing fee statute apply prospectively to cases pending direct appeal prior to June 7, 2018. *Ramirez*, 191 Wn.2d at 738. Accordingly, the change in law applies to Mr. Dunbar's case. Because Mr. Dunbar is indigent, the criminal filing fee must be struck pursuant to *Ramirez*.

The change in law also prohibits imposition of a DNA collection fee when the State has previously collected the offender's DNA as a result of a prior felony conviction. LAWS OF 2018, ch. 269, § 18. The uncontested record establishes this fact. Mr. Dunbar has multiple Washington State felonies since 1990. Since that time, Washington law has required defendants with a felony conviction to provide a DNA sample. LAWS OF 1989, ch. 350, § 4; RCW 43.43.754. Given the uncontested record, we presume that a DNA sample has been collected from Mr. Dunbar prior to the current judgment and sentence. We therefore direct the trial court to also strike the DNA collection fee.

11

No. 35314-1-III
*State v. Dunbar*

Affirmed but remanded to strike the criminal filing fee and DNA collection fee.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, C.J.

WE CONCUR:

Korsmo, J.

Siddoway, J.