IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint Petition of | ) ) ) | No. 79040-4-I |
| JARON LAMAR COX, | ) ) | UNPUBLISHED OPINION |
| Petitioner. | ) | |

BOWMAN, J. — In this personal restraint petition (PRP), Jaron Lamar Cox argues we should reverse his 2018 conviction for first degree attempted murder or remand for a reference hearing because newly discovered evidence shows he was wrongfully convicted. According to Cox, a man he met in prison could testify that someone other than Cox shot the victim. Cox also argues we should reverse his conviction because he was denied his constitutional right to a jury sourced from a fair cross section of the community. We deny his PRP.

FACTS

Alden Gibbs Jr. was shot in the early morning hours of January 16, 2017. The night leading to the shooting, both Cox and Gibbs attended "all-black night" at Stage Seattle Nightclub in Pioneer Square, where "everybody was wearing black . . . clothing." Cox wore a black zip-up jacket with "white lettering on the front" and large "white lettering across the back."

When Stage closed at about 1:30 a.m., several people gathered on the streets outside. Cox and his friends stood outside the club at the opening of a

Citations and pin cites are based on the Westlaw online version of the cited material.

nearby alley. At some point, Cox walked to his car in the adjacent parking lot. Video from a building across the street shows that after Cox walked away, a fight broke out involving Gibbs. According to trial testimony, one of Cox's friends, "Big Mike," called the woman Gibbs was walking with a "bitch." Gibbs confronted Big Mike, and the fight ensued. Video shows that during the fight, Gibbs pushed Big Mike onto the hood of a black SUV[1] stopped in the alley. Then, as the SUV backed away, a man in a black jacket with large, white writing across the back approached the alley from the parking lot, extended his right arm straight out in front of him, and shot Gibbs 11 times. The shooter then turned around and headed back into the parking lot.

Several Seattle Police Department officers were patrolling Pioneer Square on foot that night and heard the commotion from the fight. As officers approached the area, they heard the shooting. Officer Jennifer Hunt saw the shooting and that the shooter was wearing a "black zip-up jacket" with "large, white cursive writing" across the back. Officer Hunt watched the shooter retreat to the parking lot until Officer Scott Barker stopped and arrested him.

Officer Barker had parked his patrol car near the parking lot next to Stage and was standing on the sidewalk when he saw the fight and heard "multiple" gunshots. Officer Barker did not see the shooter, but as he approached the commotion, he saw Cox walking through the parking lot away from the alley "nonchalantly, calmly, when everyone else was kind of frantic." When Cox "made eye contact" with Officer Barker, he started running. Officer Barker yelled

---

[1] Sport-utility vehicle.

for Cox to stop and arrested him. Under a car about two feet from Cox, officers found a pistol. Forensic testing matched cartridges from that gun to seven bullet shell casings officers found at the scene of the shooting.[2]

The State charged Cox with attempted first degree murder and first degree assault with firearm enhancements. A jury convicted Cox of both charges. On the State's motion, the trial court vacated Cox's first degree assault conviction because both convictions were "based on the same [criminal] conduct." The court sentenced Cox to 210 months' imprisonment plus a consecutive 60-month firearm enhancement.

Cox appealed his conviction, arguing that the evidence did not show he acted with premeditated intent, that the to-convict jury instruction relieved the State of its burden to prove premeditation, that the State withheld and the trial court excluded material impeachment evidence, and that the prosecutor committed misconduct during closing argument. We affirmed. State v. Cox, No. 78398-0-I (Wash. Ct. App. Feb. 3, 2020) (unpublished), https://www.courts.wa. gov/opinions/pdf/783980.pdf, review denied, 195 Wn.2d 1030, 468 P.3d 614 (2020).

While serving his prison sentence, Cox met an inmate named Sharmarke Abib. According to Cox, Abib said he was present the night Gibbs was shot. Abib claimed he was in the black SUV in the alley during the fight, saw the shooter, and knew it was not Cox. Private investigator Morgan Armijo then interviewed Abib over the telephone and submitted a declaration summarizing

---

[2] Officers also found an eighth casing, bullet fragments, and a "bullet jacket."

their conversation. Abib told Armijo that "he was in a black Cadillac Escalade with two or three other people and the shooting took place directly in front of the vehicle." Abib "confirmed" he saw the shooting and "said Mr. Cox was not the shooter." Abib told Armijo that he "did not recognize the shooter and does not know who the shooter was." But Abib knew the shooter was not Cox because he met Cox and "know[s] what he looks like." Abib also told Armijo that he would not meet in person and would not testify in court because he "fears no one would believe his testimony because he has a criminal record" and because "he lives by a code, and testifying in court is contrary to it." Armijo tried to contact Abib twice more but could not reach him.

Cox filed this PRP.

ANALYSIS

Cox argues that he is entitled to a new trial, or at least a reference hearing, based on the newly discovered testimony of Abib. Cox also argues that a new trial is warranted because King County's racially disparate jury assignment areas deprived him of his constitutional right to a fair trial.

Relief through a PRP is extraordinary. In re Pers. Restraint of Coats, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). To obtain relief, a petitioner must show that he is currently under restraint and that the restraint is unlawful. RAP 16.4(a); In re Pers. Restraint of Grantham, 168 Wn.2d 204, 212-13, 227 P.3d 285 (2010). A petitioner must establish either a nonconstitutional error that amounts to a fundamental defect resulting in a complete miscarriage of justice or a constitutional error resulting in actual and substantial prejudice. In re Pers.

Restraint of Cook, 114 Wn.2d 802, 813, 792 P.2d 506 (1990); In re Pers. Restraint of Hews, 99 Wn.2d 80, 87, 660 P.2d 263 (1983).

Newly Discovered Evidence

Cox argues that Abib's statements to Armijo exonerate him and amount to newly discovered evidence. The State argues the statements fall short of the evidence required to support reversal or remand. We agree with the State.

A person is unlawfully restrained when "[m]aterial facts exist which have not been previously presented and heard, which in the interest of justice require vacation of the conviction." RAP 16.4(c)(3); In re Pers. Restraint of Lord, 123 Wn.2d 296, 319, 868 P.2d 835 (1994) (newly discovered evidence grounds for relief in a PRP if new facts require vacation of conviction in the interest of justice). Vacation of a conviction is required in the interest of justice if newly discovered evidence " '(1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching.' " In re Pers. Restraint of Bradford, 140 Wn. App. 124, 129-30, 165 P.3d 31 (2007) (quoting Lord, 123 Wn.2d at 320). "The absence of any one of the five factors is grounds for the denial of a new trial." State v. Williams, 96 Wn.2d 215, 223, 634 P.2d 868 (1981).

A petitioner must provide evidentiary support for his allegations. RAP 16.7(a)(2). If the record does not support the factual allegations, then the petitioner must show through affidavits or other forms of corroboration that competent and admissible evidence will establish the factual allegations. In re

5

Pers. Restraint of Rice, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). "If the petitioner's evidence is based on knowledge in the possession of others, he may not simply state what he thinks those others would say, but must present their affidavits or other corroborative evidence." Id. The petitioner may not rely on mere speculation, conjecture, or hearsay. Id. If there are material disputed questions of fact, we will direct the trial court to hold a reference hearing to resolve the factual questions. Id. at 886-87.

In support of his argument for a new trial, Cox offers the declaration from Armijo describing statements made to him by Abib. Cox does not dispute that Abib's statements to Armijo are hearsay and do not amount to admissible evidence. See ER 801(c) ("hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"), 802 (hearsay is not admissible except as provided by rule or statute). But, citing In re Personal Restraint of Salsbery, No. 54036-3-II, slip op. at 1-4, 7-8 (Wash. Ct. App. Oct. 6, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054036-3-II%20Unpublished%20Opinion.pdf, and In re Personal Restraint of Cox, No. 79664-0-I, slip op. at 8-20 (Wash. Ct. App. Sept. 3, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/796640.pdf,[3] Cox argues that he need not provide admissible evidence to warrant an evidentiary hearing on his allegations. Instead, he argues he "need only show, based on more than speculation, that he would have

---

[3] "Unpublished opinions of the Court of Appeals have no precedential value and are not binding," but cases filed after March 1, 2013 "may be accorded such persuasive value as the court deems appropriate." GR 14.1(a).

admissible evidence if granted an evidentiary hearing." But neither case supports Cox's assertion. See Salsbery, No. 54036-3-II, slip op. at 5 (petitioner may not rely on hearsay); Cox, No. 79664-0-I, slip op. at 6 (if allegations depend on the knowledge of others, petitioner must present their affidavits or other corroborative evidence). Abib's statements to Armijo are hearsay and fall short of admissible evidence.

Alternatively, Cox argues that Armijo's declaration describing Abib's statements amounts to "other corroborative evidence," enhancing the credibility of Abib's statements and warranting a reference hearing. But corroboration implies facts or circumstances that support or make more certain an initial premise. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 512 (2002) (defining "corroborate" as "to provide evidence of the truth of : make more certain : CONFIRM"). And testimony from Armijo that Abib repeated his statements over the phone and that Armijo memorialized them in writing does not make Abib's statements more certain, it merely repeats them.

Cox does not show competent, admissible, newly discovered evidence warranting reversal of his conviction or remand for a reference hearing.

Fair Cross Section

Cox argues the "division of the King County Superior Court into racially disparate jury districts" deprived him of his constitutional right to trial by jury. But even assuming his argument has merit, Cox offers no evidence that his jury

panel was drawn from a disproportionate master jury list, so he cannot show actual and substantial prejudice.[4]

The Sixth and Fourteenth Amendments to the United States Constitution guarantee criminal defendants the right to a jury representative of their community. Taylor v. Louisiana, 419 U.S. 522, 530, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); State v. Hilliard, 89 Wn.2d 430, 440, 573 P.2d 22 (1977). A representative jury is one sourced from a fair cross section of the community. Hilliard, 89 Wn.2d at 440.

To prevail on a fair-cross-section claim, a defendant must show

"(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process."

State v. Cienfuegos, 144 Wn.2d 222, 232, 25 P.3d 1011 (2001) (quoting Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979)). The State may rebut a fair-cross-section claim by showing that "attainment of a fair cross section" is "incompatible with a significant state interest." Duren, 439 U.S. at 368.

Each county in Washington identifies potential jurors by creating a "jury source list." RCW 2.36.054. A "jury source list" consists of "all registered

---

[4] Cox also argues our state constitution demands broader protection from racially disparate jury pools than the federal constitution. But because Cox offers no evidence that his jury panel was selected from a disproportionate master jury list, we do not reach his state constitutional argument. We note that our Supreme Court recently accepted review of whether article I, sections 21 and/or 22 of the Washington State Constitution provide greater protection of a defendant's fair-cross-section rights than the United States Constitution. See Ruling Accepting Certification, State v. Rivers, No. 100922-4 (Wash. May 12, 2022).

voters," "licensed drivers," and "identicard holders" residing in the county. RCW 2.36.010(10).[5] Courts randomly select jurors from the jury source list or use an exact duplicate of the jury source list to create a "master jury list." RCW 2.36.010(12). Courts then randomly summon a "jury panel" from the master jury list for each jury term.[6] RCW 2.36.010(9), (12). The court draws the jurors for an individual case by lot from the jury panel to form the "petit jury."[7] RCW 2.36.010(13).

A defendant "is not entitled to exact cross-representation in the jury pool, nor need the jury selected for his trial be of any particular composition." Hilliard, 89 Wn.2d at 442. "The point at which to consider the constitutionality of the selection process has usually been at the selection of a master list from which the panel for each jury term is selected." State v. Salinas, 87 Wn.2d 112, 115, 549 P.2d 712 (1976).

In 2005, our legislature determined that counties "with more than one superior court facility" may divide the jury source list into "jury assignment areas." RCW 2.36.055; LAWS OF 2005, ch. 199, § 2.[8] As a result, King County Superior Court enacted Local General Rule (KCLGR) 18. KCLGR 18(e)(1) divides the King County jury source list "into a Seattle jury assignment area and a Kent jury

---

[5] The legislature has amended the definitions in RCW 2.36.010 twice since Cox's 2018 trial. LAWS OF 2019, ch. 41, § 1; LAWS OF 2021, ch. 10, § 6. The legislature did not change the definitions pertinent to our analysis in either amendment, so we cite the current statute.

[6] A "jury term" is a time period of "one or more days, not exceeding two weeks," during which "summoned jurors must be available to report for juror service." RCW 2.36.010(11).

[7] A "petit jury" is a "body of persons twelve or less in number in the superior court . . . sworn to try and determine a question of fact." RCW 2.36.010(13).

[8] Our Supreme Court upheld the constitutionality of RCW 2.36.055 in State v. Lanciloti, 165 Wn.2d 661, 672, 201 P.3d 323 (2009).

assignment area that consist of registered voters and licensed drivers and identicard holders residing in each jury assignment area." Jurors who live in Seattle or any area in King County north of Interstate 90 are summoned to the Seattle jury assignment area. State v. Lanciloti, 165 Wn.2d 661, 665, 201 P.3d 323 (2009). Jurors who live in any other area of King County are summoned to the Kent jury assignment area. Id.

Cox contends that KCLGR 18 creates two racially disparate districts, leaving Black defendants in the Seattle jury assignment area less likely to be tried by a diverse jury than those in the Kent jury assignment area.[9] He argues that discriminatory practices such as redlining[10] and the use of racially restrictive covenants forced potential Black jurors out of Seattle and into adjacent communities to the south like Renton and Kent.[11] Cox urges us to interpret our state constitution independently of the Sixth Amendment, reject the Duren test, and hold that "a superior court violates the fair-cross-section requirement when it divides the county into two jury districts that have been rendered racially unequal by long-time state action." Cox argues the disparity actually and substantially

---

[9] Cox cites a 2016 report in which United States Census Bureau data shows Black adults make up 8.11 percent of the population in the Kent jury assignment area and 4.14 percent of the Seattle area. See Katherine Beckett, Report: The Under-Representation of Blacks in the King County Jury Pool 6, 10 (Univ. of Wash. May 11, 2016), https://kingcounty.gov/~/media/ depts/public-defense/Documents/King_County_Jury_Report_Beckett_2016.ashx?la=en.

[10] To "redline" is "to withhold home-loan funds or insurance from neighborhoods considered poor economic risks . . . : to discriminate against in housing or insurance." WEBSTER'S at 124a.

[11] Cox cites a 2007 law review article to show that between 1990 and 2000, the Black population of Seattle fell from 10.1 to 8.4 percent. See Henry W. McGee, Jr., Seattle's Central District, 1990-2006: Integration or Displacement?, 39 Urb. Law. 167, 183-84 (Spring 2007). At the same time, the Black population of Renton rose from 6.5 to 8.5 percent and the Black population of Kent rose from 3.8 to 8.2 percent. McGee, supra, at 183-84.

prejudiced him because it increased his "odds of conviction."[12]  But actual and substantial prejudice arising from constitutional error must amount to more than possible prejudice.  Hews, 99 Wn.2d at 93.  Even assuming Cox's argument has merit, he offers no evidence that his jury panel was selected from a disproportionate master jury list.  As a result, we reject his claim.

Because Cox fails to show newly discovered evidence warrants reversal of his conviction or remand for a reference hearing and he offers no evidence of actual and substantial prejudice to support his constitutional fair-cross-section claim, we deny his PRP.

Brennan, J

WE CONCUR:

Coburn, J.                    Mann, J.

---

[12] Cox cites a 2012 Harvard University article stating that Black defendants are less likely to be convicted by a jury with one Black person than a jury with no Black members.  Shamena Anwar, Patrick Bayer & Randi Hjalmarsson, The Impact of Jury Race in Criminal Trials, 127 Q. J. ECON. 1017, 1032 (2012).