# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>STONNEY MARCUS RIVERS,<br><br>Appellant. | No. 85314-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — Stonney Rivers appeals his criminal convictions for murder in the first degree and assault in the second degree. In addition to challenging his conviction, he challenges his two consecutive sentences to life without the possibility of release under Washington's Persistent Offender Accountability Act (POAA), RCW 9.94A.030(27), .570, asserting that sentencing under that law depends on a question of fact on which he had a right to trial by jury under the Sixth Amendment and Erlinger v. United States, 602 U.S. 821, 144 S. Ct. 1840, 219 L. Ed. 2d 451 (2024). We (1) affirm Rivers's conviction, (2) hold, consistent with Washington Supreme Court law, that a judge may make the determinations necessary to sentence under the POAA without violating the Sixth Amendment or Erlinger, and (3) remand with directions to strike the victim penalty assessment (VPA) and make the life sentences concurrent as ministerial matters.

I

The parties presented the following evidence at trial pertinent to the issues raised on appeal.

On the early morning of November 2, 2017, David Cabrera and his girlfriend Amber Barton drove to the Golden Kent Motel to rent a room. Along with two others, they stayed in the motel room for a couple of hours smoking methamphetamine. Cabrera and Barton planned to retrieve Barton's car from impound after leaving the motel, which would cost $700, and had the money with them. Cabrera held both his and Barton's cash, and Barton testified Cabrera had "at least a thousand dollars on him" that night. Barton had been Cabrera's drug dealer and Cabrera was selling drugs. Cabrera had a dark colored backpack that he carried everywhere and in which he kept his drugs and a scale. Cabrera kept money either in his front pocket or in his backpack. Barton testified Cabrera possessed a gun but "it didn't even work because he didn't have a clip for it when he got it," and said she did not see him with a gun that night.[1]

At 6:35 a.m., a person using an account belonging to Brandy Bateman messaged Cabrera, "I got a plug for you dude 2 zis of clear and a zip of dark how much." This referred to a drug connection having methamphetamine and heroin.

---

[1] There was other evidence about whether Cabrera had a gun, including his brother's testimony about bringing him one in a car he loaned Cabrera. Rivers's principal challenge to the trial evidence is his challenge to its sufficiency to support robbery, a challenge on which Rivers admits the truth of the State's evidence and all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). In light of this standard, we will at times omit reference to conflicting and other evidence not affecting our review.

2

Bateman was identified as the significant other of Theneious Swafford. The State presented evidence that approximately a week earlier, Rivers had messaged Bateman's account saying, "Dean[,] Stonney here, get back with me later." Swafford went by both Dean Swafford and Tee Swafford. At 7:07 a.m., Bateman's account was used again to message "where the f*** are you bro you have me drive up here for nothing." At the time of that message, surveillance video showed that Swafford was at the Motel 6 on Military Road South.

At around 7:08 a.m., Swafford picked up Rivers. Rivers testified his plan that day was to obtain heroin "so I could make a couple hundred bucks proper, the middle man. . . . [A friend] wanted to buy some heroin so he can take it back to Spokane with him and sell it and make a profit." Swafford drove them to the Golden Kent Motel, arriving around 7:20 a.m., where he left Rivers and another person in the car for about 10 to 15 minutes.

Barton testified that Swafford arrived at the motel room. Cabrera and Swafford sat in the room smoking and talking for approximately 15 to 20 minutes before Swafford left and drove away. Back in the vehicle, Rivers attempted to buy drugs from Swafford, who declined. Rivers asked Swafford if he could go to where Swafford had just obtained his drugs. Swafford agreed, told Rivers he obtained drugs from room 18 at the Golden Kent Motel, and dropped Rivers off next door so Rivers could walk back to the motel.

Video surveillance evidence showed Rivers arrive at the motel, walk to room 18, open the door, step inside, and shut the door behind him. Barton testified that a few minutes after Swafford left, Rivers, whom she did not know, "just walked into

3

the hotel room unannounced, uninvited." Barton testified she said, "Who the fuck are you? What are you doing?," and Rivers "didn't respond with words. He just kind of nodded and just kind of bobbed his head. He didn't actually say anything to me." Barton assumed that Cabrera knew him so she called for Cabrera "maybe three times before [Cabrera] actually got up out of bed and came down the hallway."

Barton testified that as Cabrera came down the hallway "I could tell by the look on his face that something was amiss, like he didn't—something was wrong." When asked, "[W]hen [Cabrera] came out, did it appear he knew him like he knew [Swafford]?," Barton answered, "No, not at all. I could tell before [Cabrera] even said anything that something was amiss, that he wasn't familiar with him."

Barton testified that when Cabrera "came down the hallway, he said: What's up, man? What can I do for you?" Rivers replied, "I'm just trying to get on, I'm just trying to get some shit." Barton responded, "Get the fuck out of here" and testified that Rivers "responded by pulling his gun out and putting it in my face and saying: Shut the fuck up, bitch, or I'm going to kill you." Cabrera put his hands up. Barton testified that Rivers "turned and shot [Cabrera] in the face." Barton testified the gun came from "behind [Rivers's] back."

Dr. Micheline Lubin, deputy chief medical examiner at the King County Medical Examiner's Office, testified there was no soot or stippling associated with Cabrera's wound, and explained stippling could be seen if a weapon was discharged up to two feet from the body. Dr. Lubin testified the bullet traveled from front to back, and there was no significant right to left or up and down deviation.

4

After Cabrera was shot, Barton ran out the door "to the left because I was expecting him to shoot me in the back." Approximately 41 seconds elapsed between Rivers's entry into the room and Barton's exit. Surveillance video captured Rivers pointing the gun out the door while Barton ran away. Barton ran into a man in the laundry room and yelled to him to call the police because "he shot my boyfriend." That person testified roughly similarly to Barton's account and stated he saw the gun point out of the doorway. Barton later admitted to moving two bongs from the room and placing them on her car before meeting an arriving police officer. A police crime scene technician supervisor examined the scene and found no drugs except for a small bag of heroin.

Barton saw Rivers walking down the sidewalk with Cabrera's backpack. As Rivers reached the street, surveillance footage captured him place something in his back pocket. Rivers testified that as he was leaving the motel, he placed his cell phone in his back pocket. On cross-examination, Rivers acknowledged his phone was black, whereas surveillance footage showed a light-colored item, which the State argued in closing was currency.

According to Rivers, he knocked on the door to room 18 and he "came through the door" because "it wasn't shut all the way." Rivers testified a female's voice told him to "come in" when he knocked on the door, so he went in and shut the door behind him. He said Barton called for Cabrera who came "out the back room with a gun in his hands." Rivers testified that as Cabrera put the gun closer to his face, Rivers "[made] a move for him," and "grabbed his hand with the gun and we struggle over the control of it." The gun went off once, and Cabrera and

the gun fell to the ground. Rivers said he took a backpack, put the gun in it, and left. Rivers took the gun because he "didn't want to go off down the street with it in broad daylight, so—and I didn't want to leave it so if somebody comes back and gets it and uses it against me." Rivers rejoined Swafford. Swafford dropped Rivers off at an apartment complex, where Rivers threw the backpack in the garbage without checking its contents.

The police released still images of Swafford and Rivers to the media. The release did not mention that a robbery had occurred. On November 11, 2017, Rivers turned himself into the King County Jail for what he described as "something about a murder or a robbery." Rivers and Swafford were charged as codefendants with felony murder predicated on robbery in the first degree. Rivers was also charged with assault in the second degree.[2] The jury found Rivers guilty of murder in the first degree and assault in the second degree.

Rivers's sentencing was held on April 21, 2023. For purposes of proving two prior strikes under the POAA, the State called Mark Roberts, a latent fingerprint examiner, to confirm that the fingerprints from a 1995 robbery in the first degree and a 1989 assault in the second degree matched Rivers's fingerprints. The trial court admitted both convictions, along with others, as exhibits at sentencing.[3]

---

[2] Swafford was also charged with identity theft in connection with his acquisition of the vehicle he was using, and that charge was tried along with the other charges. In closing argument, the State disclaimed intent to allege that Swafford obtained the vehicle to facilitate another crime. Swafford was convicted of identity theft but acquitted of murder.

[3] The 1989 and 1995 judgment and sentences were not transmitted to this court as exhibits, but appear in the clerk's papers as appendices to the State's sentencing memorandum.

Rivers did not dispute the applicability of the POAA, though he argued the POAA should not be enforced because of its having racially disproportionate effect. The trial court sentenced Rivers to life in prison without the possibility of release on each count consecutively, as a third strike. There is neither a written finding in the judgment and sentence nor an oral finding specifically addressed to the statutory requirements of the POAA. The trial court imposed the VPA and waived all other costs, finding Rivers was indigent. The trial court and counsel signed the judgment and sentence, but Rivers did not. Rivers appeals.

II

We first address Rivers's challenges to his conviction.

A

Rivers argues the State presented insufficient evidence of felony murder predicated on robbery because the evidence failed to support robbery. We disagree.

In reviewing a claim for insufficient evidence, we consider " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime *beyond a reasonable doubt.*' " State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (emphasis added) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)), overruled on other grounds by Washington v. Recuenco, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006). In a sufficiency of the evidence claim, the defendant admits the truth of the State's evidence and all inferences that reasonably can be drawn from that evidence. State v. Colquitt, 133

7

Wn. App. 789, 796, 137 P.3d 892 (2006). Sufficiency of the evidence is a question of constitutional law that we review de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

To convict Rivers of felony murder predicated on robbery, the State had to prove beyond a reasonable doubt that Rivers or an accomplice committed or attempted to commit robbery in the first degree "and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, cause[d] the death of a person other than one of the participants." RCW 9A.32.030(c)(1). "To establish that a killing occurred in the course of, in furtherance of, or in immediate flight from a felony, there must be an 'intimate connection' between the killing and the felony." State v. Brown, 132 Wn.2d 529, 607-08, 940 P.2d 546 (1997) (quoting State v. Golladay, 78 Wn.2d 121, 132, 470 P.2d 191 (1970)), overruled on other grounds by State v. Arndt, 87 Wn.2d 374, 378, 553 P.2d 1328 (1976)).

A person commits robbery in the first degree when "[i]n the commission of a robbery or of immediate flight therefrom, he or she: (i) Is armed with a deadly weapon; or (ii) Displays what appears to be a firearm or other deadly weapon; or (iii) inflicts bodily injury." RCW 9A.56.200. A person commits the crime of robbery when they "unlawfully take[] property from a person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person or his or her property or the person or property of anyone." RCW 9A.56.190. The force or fear "must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the

8

taking." RCW 9A.56.190. The jury was instructed that "[t]he taking constitutes robbery, even if death precedes the taking, if the intent to commit theft is formed before or at the time of the death and when the taking and homicide are part of the same transaction." When intent is an element of the crime, "intent to commit a crime may be inferred if the defendant's conduct and surrounding facts and circumstances plainly indicate such an intent as a matter of logical probability." State v. Woods, 63 Wn. App. 588, 591, 821 P.2d 1235 (1991).

In State v. Allen, the court held there was sufficient evidence to affirm Allen's conviction of murder in the first degree with the aggravator of robbery where the defendant "used force, at least in part, to obtain the cashbox." 159 Wn.2d 1, 8-9, 147 P.3d 581 (2006). The case discussed the necessary relationship between the use of force and the taking of property. Allen's confession portrayed his removal of the cashbox as an afterthought. Id. at 5. But circumstantial evidence suggested that he intended from the beginning of the encounter to take his mother's money: he frequently was short of money; his mother had recently refused his request for $400 to buy a car; he had told a friend about the cashbox before the murder; the cashbox was found nearby after the murder; and he told a cellmate he took the cashbox after killing his mother and found $1,100 in it and spent it. Id. at 9-10. The court clarified the sufficiency of the evidence standard in a footnote responding to the dissent,

> We largely agree with the dissent. "*Merely demonstrating that the use of force preceded the theft does not amount to robbery.*" Dissent at 12 (footnote omitted). But as surveyed above, there was sufficient evidence presented for a reasonable jury to find that *robbery was one of Allen's purposes for killing*. A reasonable jury could also have

9

> found, as the dissent would, that taking the cashbox was an afterthought. This one did not.

Id. at 10 n.4 (emphasis added). Arguing the State's evidence showed no more than that the use of force preceded any theft, Rivers challenges the sufficiency of the evidence that he killed Cabrera for the express purpose of taking his drugs and money.

While it is true that, unlike Allen, Rivers did not confess to robbing Cabrera and did not have a history of financial problems, there was nevertheless circumstantial evidence sufficient for the jury to find that robbery was one of his purposes for killing. Barton testified that Rivers entered the motel room uninvited and unannounced, and declared an intent to "get on," or—inferentially—obtain drugs. After Barton denied him the drugs and demanded he leave, Rivers made a display of force by drawing a gun and threatening Barton with it. Dr. Lubin testified that the bullet path was straight through the brain with no vertical or horizontal deviation and no stippling or soot, which supports the inference that the shot was from approximately two feet or farther away and therefore that there was no close struggle. Barton testified that Rivers entered the motel room with a gun, and Dr. Lubin's testimony supports an inference that he did. Rivers's own testimony indicated a focus on obtaining drugs as a means of making money, which implies more than taking an amount for personal use and is consistent with apparently leaving almost no drugs behind in the room with admitted drug dealers. Surveillance footage showed Rivers leaving with an item that could be currency. Rivers surrendered himself at the King County Jail indicating his belief he was wanted for questioning in connection with a robbery even though no public

statements had been released describing the incident as a robbery. This evidence was sufficient for a rational jury to find robbery and that Cabrera's death occurred in the course of it beyond a reasonable doubt.

B

Rivers argues he was denied his right to a fair and impartial jury where the trial court denied his motion to remove a prejudiced juror for cause. We disagree.

During voir dire, juror 149 was individually questioned regarding their responses to the juror questionnaire. Juror 149 had stated in the questionnaire that they agreed Black people commit a disproportionate number of crimes. After a lengthy colloquy, Rivers moved to excuse juror 149 for cause, which the trial court denied. Outside the presence of the jury, Rivers made a record of the basis for his cause challenge. During peremptory challenges, Rivers excused juror 149. This is dispositive of his assignment of error.

In United States v. Martinez-Salazar, the United States Supreme Court held that "if the defendant elects to cure [an erroneously denied cause challenge] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right." 528 U.S. 304, 307, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000). Our Supreme Court followed suit, concluding that after State v. Roberts, 142 Wn.2d 471, 14 P.3d 713 (2000), the court "no longer recognizes that the forced use of a peremptory challenge constitutes the loss or deprivation of a challenge." State v. Fire, 145 Wn.2d 152, 163, 34 P.3d 1218 (2001). Because article 1, section 22 of the Washington constitution does not provide more protection than the Sixth

11

Amendment, Martinez-Salazar defines the scope of a defendant's right to an impartial jury in this situation. Id.

Because Rivers used a peremptory strike to remove the allegedly biased juror, Rivers fails to show that a biased juror sat on his panel and under controlling case law does not show prejudice based on use of a peremptory strike. Rivers does not show that he was deprived of his right to a fair and impartial jury.

C

Rivers argues the trial court erred when it declined to instruct the jury on excusable homicide. We disagree.

Washington's felony murder statute does not set forth a requisite mental state; instead, the state of mind required for the murder is the same as that which is required to prove the predicate felony. State v. Dennison, 115 Wn.2d 609, 615, 801 P.2d 193 (1990). Thus, if a death occurs in the attempt, commission of, or immediate flight from a predicate felony, it is unnecessary to prove that the killer or another participant acted with malice, design, or premeditation. Id. Even if the murder is committed accidently during the commission of a predicate felony, the participants in the felony are still liable for the homicide. See State v. Leech, 114 Wn.2d 700, 708, 790 P.2d 160 (1990) (the purpose of the felony murder rule is to deter felons from killing negligently or accidently by holding them strictly responsible for any deaths they cause), abrogated on other grounds by In re Pers. Restraint of Andress, 147 Wn.2d 602, 56 P.3d 981 (2002). Because the trial court refused to give the instruction based on a ruling of law, we review its decision de novo. State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998).

12

The state of mind of a defendant at the time of the killing is not an element of the crime of felony murder. In State v. Craig, 82 Wn.2d 777, 778, 514 P.2d 151 (1973), the appellant and a co-defendant beat and stabbed an individual to death in the course of committing a robbery. The appellant was charged with felony murder and sought a self-defense instruction. Id. at 782-83. The Supreme Court said the trial court properly refused the instruction because

> [n]owhere in the statute is the state of mind of the defendant at the time of the killing made an element of the offense [of felony murder]. . . .
>
> . . . .
>
> . . . The burden was on the state to show the killing by the defendant and that it was done in connection with the robbery, as part of the same transaction. It was not incumbent upon it to prove the state of mind of the defendant at the time of the killing.

Id.

The relevant question here is whether Rivers had the intent to rob Cabrera. If Rivers intended to rob Cabrera, he would be strictly liable for any resulting homicide. In contrast, if the jury doubted that Rivers had the intent to rob Cabrera, it could not have convicted under the charge of felony murder, the only murder charge submitted to it. The cases cited by Rivers, State v. Brightman, 155 Wn.2d 506, 509-11, 122 P.3d 150 (2005), and State v. Slaughter, 143 Wn. App. 936, 941, 186 P.3d 1084 (2008), are distinguishable. Both Brightman and Slaughter involved charges of intentional murder along with charges of felony murder. Brightman, 155 Wn.2d 511; Slaughter, 143 Wn. App. 941. Rivers was solely charged with felony murder predicated on robbery, and was not charged with a separate crime that

would necessitate giving an instruction on excusable homicide. The trial court did not err by refusing the proposed instruction.

D

Rivers argues the prosecutor committed misconduct during his closing argument by arguing that Barton had no reason to lie and by misstating the evidence. Here, any misconduct does not require reversal.

To prove prosecutorial misconduct, a defendant must establish " 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.' " State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (quoting State v. Hughes, 118 Wn. App. 713, 727, 77 P.3d 681 (2003)). " 'Prejudice is established only if there is a substantial likelihood [that] the instances of misconduct affected the jury's verdict.' " Id. (alteration in the original) (quoting State v. Pirtle, 127 Wn.2d 628, 672, 904 P.2d 245 (1995)). We review a prosecutor's comment during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. Brown, 132 Wn.2d at 561

Rivers argues the prosecutor misstated the evidence in his closing argument by arguing that "Barton informed the jury that [Cabrera] did not know Rivers." In recounting Barton's testimony from the time she obtained a room at the motel to the time when Rivers walked into the motel room, the prosecutor stated that Barton

> then called for [Cabrera] thinking maybe it was someone [Cabrera] knew. She had to call for [Cabrera] several times because [Cabrera] was lying down in the back bedroom. [Cabrera] comes out. She can

14

tell from [Cabrera's] reaction he doesn't know who this person is, and the only person who tells you that he did know him was [Rivers]. He didn't know [Rivers].

Rivers argues the statement that Barton could tell Cabrera did not know him was unsupported by the evidence.

When asked on direct examination whether it appeared Cabrera knew Rivers, Barton testified, "No, not at all. I could tell before [Cabrera] even said anything that something was amiss, that he wasn't familiar with him." The prosecutor did not misstate the evidence, and Rivers fails to meet his burden that this argument was improper.

Rivers further argues the prosecutor improperly vouched for Barton's credibility. Improper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness. State v. Ish, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). Whether a witness testifies truthfully is an issue entirely within the province of the trier of fact. Id. In closing argument, the prosecutor has wide latitude to argue reasonable inferences from the evidence, including evidence respecting the credibility of witnesses. State v. Thorgerson, 172 Wn.2d 438, 448, 258 P.3d 43 (2011) .

Here, the prosecutor addressed the jury instructions, ending with an instruction on witness credibility, before turning to Barton's credibility:

> You have an instruction about the credibility of witnesses, and what's important there is that you are the sole judges, the jury are the sole judges of the credibility of witnesses; not what I say, not what [Rivers's defense counsel] says, not what [Swafford's defense counsel] says. It is your assessment of witnesses on the stand, it is your assessment of their testimony and how to assess them, and

15

you're given things to look at. Some of those are the manner in which they testified, some of them are the consistency with which they testified, some had to do with any personal bias or benefit they may get from their testimony. So keep that in mind.

So let's talk about [Barton]. [Barton] got on the stand and safe to say, she wasn't happy to be here. But she told you what happened on November 2nd of 2017. And as you go through and think about her testimony, ask yourself, *what does she have to gain to lie about any of this?*

(Emphasis added.) Rivers objected "[a]s to what does she have to gain and what would she have to lie about," which the trial court overruled. The prosecutor did not provide a proposed answer to the rhetorical question, and instead continued, "The jury instructions are clear. You can look at someone's potential bias and personal interest. What does she have to gain from this?" The prosecutor then turned to Barton's testimony, saying,

And at that point [Barton] said she got concerned and said: Who the fuck are you? Get the fuck out of here. Pulls a gun from his waistband and points it at her and says shut the fuck up, bitch, or I'm going to kill you. [Cabrera] puts his hands up, not on, puts his hands up as we've heard her consistently say throughout this entire investigation. [Rivers] turned—

[RIVERS'S DEFENSE COUNSEL]: Objection, Your Honor. That's not in testimony, the entire investigation. [4]

THE COURT: The jury will determine the testimony. The court has instructed them that the lawyers' remarks, statements, and arguments are not evidence. The jurors are the finders of the evidence. Overruled.

Rivers argues this was improper vouching because it "directed the jury to disregard the fact that Cabrera and Barton were high on drugs, and dealing drugs, both reasons for Barton to testify untruthfully."

---

[4] Rivers does not mention this comment on appeal.

16

It is vouching for the prosecutor to say that a law enforcement witness would not risk their career by lying, State v. Stotts, 26 Wn. App. 2d 154, 168, 527 P.3d 842 (2023), or to introduce evidence of a plea agreement requiring a witness to testify truthfully, Ish, 170 Wn.2d at 196, 199.  In both cases, the prosecutor was placing the prestige of the State behind the witness's testimony and suggested that the prosecutor had an objective method of verifying the truthfulness of the statements.  But it is appropriate to argue, based on the evidence, that a witness lacks a personal interest in the substance of their testimony or the outcome of the matter.  See 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 1.02, at 27 (5th ed. 2021).  In State v. Robinson, 189 Wn. App. 877, 893-94, 359 P.3d 874 (2015), we approved an argument that a witness had no reason to lie.  We explained that the argument was proper because it was based on the trial evidence demonstrating lack of motive to lie, and was made without suggestion of the prosecutor having knowledge of facts outside the evidence.  Id.

In this case, we perceive a risk that the prosecutor's argument could have suggested a basis for believing Barton's testimony that was outside the evidence.  There was evidence suggesting that Barton and Cabrera were engaging in criminal drug dealing, so the prosecutor's implying that Barton had nothing to gain from lying could suggest the possibility that she no longer needed to be concerned with testifying in a manner that could expose her to prosecution.  The prosecutor would be in a unique position to have such information.  The prosecutor used a rhetorical question to which they never supplied a proposed answer, making it ambiguous whether the argument referred to an evidentiary basis for concluding Barton had

no reason to lie or to information the prosecutor had that the jury did not. This was joined with the prosecutor's statement that Barton had been consistent "throughout the entire investigation," where the "entire investigation" was not before the jury. We recognize the prosecutor did not make any such argument explicitly, but, together, these statements could suggest that the prosecutor had reason to have confidence in Barton's telling the truth outside the evidence given to the jury, for example because of an immunity agreement.

However, any error was harmless. Rivers claims he was prejudiced by the prosecutor's bolstering of Barton's testimony because the case was based on the credibility of Barton versus Rivers. Thus, by insinuating Barton had no bias or reason to lie, the prosecutor suggested that the jury should believe Barton and her testimony regarding the events in the motel room. However, the impact of any error was slight. Barton's testimony was not the only evidence tending to prove Rivers brought a gun to the motel room and killed Cabrera. Surveillance footage corroborated Barton's testimony that Rivers walked into the motel room without knocking, and stayed for a short time before Barton ran out towards the laundry room and the front office, while Rivers went the opposite direction towards the Comfort Inn. An independent eyewitness saw Barton running away from the motel room and saw a gun pointed towards her from inside the room after she left, which was also supported by video footage. The evidence supported Barton's testimony that Rivers walked in, drew the gun, and shot Cabrera, rather than Rivers's alternative explanation of Cabrera drawing the gun, a struggle ensuing, and an accidental discharge. Furthermore, Dr. Lubin testified that the bullet path was

18

straight through the brain with no vertical or horizontal deviation relative to the cranial space and no stippling or soot, which supports the inference that the shot was from 2 to 3 feet or farther away and therefore that there was no close struggle. The prosecutor referenced Barton had no reason to lie twice and did not dwell on the issue. To the extent there was any risk of vouching, there is no substantial likelihood that it affected the verdict.

### III

We next address Rivers's assertions of error in sentencing.

### A

Rivers argues he was denied his right of allocution when the trial court informed Rivers of the sentence it was imposing before asking Rivers if he wished to speak. Rivers failed to preserve this claim of error.

"Allocution is the right of a criminal defendant to make a personal argument or statement to the court before the pronouncement of sentence." State v. Canfield, 154 Wn.2d 698, 701, 116 P.3d 391 (2005). RCW 9.94A.500(1) guarantees this right, and we review an alleged violation of a statutory right de novo. State v. Hatchie, 161 Wn.2d 390, 395, 405, 166 P.3d 698 (2007). RCW 9.94A.500(1) states in relevant part, "The court shall . . . allow arguments from . . . the offender . . . as to the sentence to be imposed." "Failure by the trial court to solicit a defendant's statement in allocution constitutes legal error." Hughes, 154 Wn.2d 118, 153, 110 P.3d 192 (2005), overruled in part on other grounds by Recuenco, 548 U.S. 212.

The State alerted the trial court to its failure to solicit allocution, and Rivers at no time objected to the error. Instead, Rivers declined to speak and defense counsel indicated, "We've discussed at length what 'allocution' means. And [Rivers] chooses to rely on the comments of counsel here today." Absent any objection, no claim of error is preserved for us to review. See Hatchie, 161 Wn.2d at 405-06 (defendant failed to preserve allocution error); Canfield, 154 Wn.2d at 707-08 (same); Hughes, 154 Wn.2d at 153 (same); RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court."). Because Rivers failed to preserve the alleged error, we decline to address Rivers's allocution claim.

B

Rivers argues the trial court violated the Sixth Amendment and article 1, section 21 and 22 by imposing a sentence beyond the standard range based on findings by a judge rather than a jury. We disagree.

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt" in order to comply with the Sixth Amendment right to a jury trial. Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). To increase the statutory maximum, Blakely v. Washington, 542 U.S. 296, 303-04, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), or the mandatory minimum, Alleyne v. United States, 570 U.S. 99, 103, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), additional fact finding must be conducted by a jury. In interpreting Apprendi and Blakely, the Washington Supreme Court clarified

20

that the exception to the jury requirement under Apprendi applies "*only* for prior convictions" and that where an enhancement requires findings of "new factual determinations and conclusions" beyond " 'mere criminal history,' " those findings are required to be made by a jury. Hughes, 154 Wn.2d at 141-42 (quoting State v. Butler, 75 Wn. App. 47, 54, 876 P.2d 481 (1994)). However, our Supreme Court has recognized that where a sentence is increased because of prior convictions, as provided by Apprendi, the fact of those prior convictions need not be found by a jury. State v. Wheeler, 145 Wn.2d 116, 123-24, 34 P.3d 799 (2001). Our Supreme Court reaffirmed this in State v. Witherspoon, 180 Wn.2d 875, 891, 329 P.3d 888 (2014), where the court held that the POAA inquiry fell within Apprendi's exception for prior convictions, and prior convictions need not be proved to a jury beyond a reasonable doubt before they can be used to enhance a sentence.

Rivers primarily relies on Erlinger, the United States Supreme Court case new since Wheeler and Witherspoon. Erlinger pleaded guilty to possession of a firearm in violation of 18 U.S.C. § 922(g) and faced a sentence up to 10 years in prison. 602 U.S. at 825. However, the government charged Erlinger under the Armed Career Criminal Act (ACCA), former 18 U.S.C. § 924(e)(1) (2012), which increased his prison term to a minimum of 15 years and to a maximum of life if he had three prior convictions for " 'violent felon[ies]' " or " 'serious drug offense[s]' " that were "committed on occasions different from one another." Erlinger, 602 U.S. at 825 (quoting former 18 U.S.C. § 924(e)(1)). At a resentencing hearing, the government based its request for a 15 year sentence based on decades-old burglaries that spanned multiple days. Id. at 826. Erlinger argued the burglaries

21

had not occurred on occasions different from one another but during a single criminal episode. Id. at 827.

The United States Supreme Court held that whether the past offenses occurred on different occasions was a fact-laden task to be determined by a jury. Id. at 834. The Court reasoned that the ACCA's occasions inquiry required an examination of a range of facts, including whether past offenses were committed close in time, near to or far from one another, and whether the offenses were similar or intertwined in purpose and character. Id. at 828. The Court held that "[w]hile recognizing [Erlinger] was entitled to have a jury resolve ACCA's occasions inquiry unanimously and beyond a reasonable doubt, we decide no more than that." Id. at 835. The Court clarified that while it was not revisiting its holding in Almendarez-Torres v. United States, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998) (permitting a judge to find the fact of a prior conviction), "a judge may 'do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of.' " Erlinger, 602 U.S. at 838 (quoting Mathis v. United States, 579 U.S. 500, 511-12, 136 S. Ct. 2243, 195 L. Ed. 2d 604 (2016)).

Although the Court in Erlinger limited any potential for the Almendarez-Torres exception to expand beyond its current parameters, we interpret its comment that it was not asked to revisit Almendarez-Torres as meaning that it did not do so. This means the Court did not narrow the exception, either. The Washington Supreme Court has held that a judge's making the determinations required to sentence under the POAA falls within the scope of Almendarez-Torres.

22

In State v. Smith, 150 Wn.2d 135, 143, 75 P.3d 934 (2003), our Supreme Court stated,

> In Wheeler we followed Almendarez-Torres, wherein the United States Supreme Court expressly held that prior convictions need not be proved to a jury. Because the Court has not specifically held otherwise since then, we hold that the federal constitution does not require that prior convictions be proved to a jury beyond a reasonable doubt.

See also Wheeler, 145 Wn.2d at 124 ("Apprendi did not overrule Almendarez–Torres, and no other case has extended Apprendi to hold that the federal constitution requires recidivism be pleaded and proved to a jury beyond a reasonable doubt."). Erlinger thus expressly left undisturbed the United States Supreme Court precedent on whose basis the Washington Supreme Court has held the POAA recidivism inquiry may be made by a judge.

What is arguably new in Erlinger is a distinction between the determination of the fact of conviction and the determination of a particular relationship among the criminal acts giving rise to conviction. Before Erlinger, Washington held that "for the purposes of the POAA, a judge may find *the fact of a prior conviction.*" Witherspoon, 180 Wn.2d at 892 (emphasis added); Wheeler, 145 Wn.2d at 123 ("No court has yet extended Apprendi to hold that sentence enhancements based on *the fact of a prior conviction* are unconstitutional." (Emphasis added)). Central to the analysis in Erlinger was that sentencing enhancements under the ACCA depended on more than merely the fact of conviction, but additionally how the underlying criminal acts related to one another. 602 U.S. at 835. To be determined to be a persistent offender under the POAA, a person's history must include the

fact of prior convictions.[5]  RCW 9.94A.030(37)(a).  The statute continues that "at least one conviction must have occurred before the *commission* of any of the other most serious offenses."  RCW 9.94A.030(37)(a)(ii) (emphasis added).  Rivers essentially asks us to conclude that this is a factual determination of a certain kind of relationship among his past criminal acts similar to that in Erlinger.

We conclude that the POAA determination remains one within the Almendarez-Torres exception allowing the court to determine the fact of prior conviction, including "the jurisdiction in which the defendant's crime occurred *and its date.*"  Erlinger, 602 U.S. at 839 (emphasis added).  This allows a court to conclude a conviction for one crime occurred before the commission of another.  The Washington Supreme Court has held it is "settled law" that "the procedures" of the POAA do not violate Apprendi principles.  Witherspoon, 180 Wn.2d at 893.  This is broad enough to embrace the entirety of the POAA inquiry.  Although Erlinger clarified that defendants are entitled to a jury trial for deciding whether prior offenses occurred on separate occasions, 602 U.S. at 835, it did not overrule Almendarez-Torres.   United States Supreme Court precedent, as well as Washington Supreme Court precedent, dictate that the POAA is consistent with the Sixth Amendment and a judge may find the fact of a prior conviction.  This allowed the trial court to determine that POAA sentencing was required.

---

[5] The statute requires that the *convictions* were "on at least two separate occasions."  RCW 9.94A.030(37)(a)(ii).  But *that* question is not analogous to the ACCA occasions inquiry, which required that the *offenses* were " '*committed* on occasions different from one another.' "  Erlinger, 602 U.S. at 834 (emphasis added) (quoting former 18 U.S.C. § 924(e)(1)).

C

Rivers argues the trial court erroneously imposed the victim penalty assessment. The State concedes remand is appropriate to strike the fee. We accept the State's concession, and remand accordingly.

IV

Rivers raises additional issues in his statement of additional grounds.

A

Rivers argues his right to a fair and impartial jury was violated where the trial court did not allow Rivers jury members of his peers. We disagree.

We review constitutional challenges de novo. State v. Vance, 168 Wn.2d 754, 759, 230 P.3d 1055 (2010). A defendant has a right under the federal and state constitutions to be tried by a jury that is representative of the community. Taylor v. Louisiana, 419 U.S. 522, 538, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); State v. Hilliard, 89 Wn.2d 430, 440-42, 573 P.2d 22 (1977). Representation, however, need not be perfectly proportional to the population, and the composition of the jury need not be of any particular composition. Hilliard, 89 Wn.2d at 442. While a defendant has no right to a "petit jury composed in whole or in part of persons of [the defendant's] own race," Strauder v. West Virginia, 100 U.S. 303, 305, 25 L. Ed. 664 (1879) abrogated on other grounds by Taylor, 419 U.S. 522, they do have the right to be tried by a jury whose members are selected by nondiscriminatory criteria, Powers v. Ohio, 499 U.S. 400, 404, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991).

Rivers fails to show any constitutional violation in the selection or composition of the jury venire from which his jury was chosen. The record here does not support the claim that the trial court disallowed African American jurors from serving on the panel, and Rivers provides no basis to challenge the constitutionality of the summoning process we found to be sufficient in State v. Fleeks, 25 Wn. App. 2d 341, 364, 523 P.3d 220 (2023) (holding the defendant failed to show that representation of Black persons in King County was not fair and reasonable in relation to the number of such persons in the community).

B

Rivers argues the trial court erred by sentencing him to life in prison without the possibility of release on counts one and three consecutively. Rivers is correct.

Interpretation of the POAA, under the Sentencing Reform Act of 1981, chapter 9.94A RCW, is reviewed de novo. State v. Keller, 143 Wn.2d 267, 276, 19 P.3d 1030 (2001). Under the POAA, a persistent offender shall be sentenced to a term of total confinement for life without the possibility of release. State v. Knippling, 166 Wn.2d 93, 98, 206 P.3d 332 (2009); RCW 9.94A.570. Whenever a person is to be sentenced for two or more current offenses, sentences shall be served concurrently, and consecutive sentences may only be imposed under the exceptional sentence provisions of RCW 9.94A.535. RCW 9.94A.589(1)(a). RCW 9.94A.570 is the exclusive statutory authority for sentencing a persistent offender, meaning that " '[n]otwithstanding . . . any other provision of this chapter,' " Rivers must be sentenced to a term of total confinement for life without the possibility of release. State v. Crumble, 142 Wn. App. 798, 802, 177 P.3d 129 (2008) (emphasis

omitted) (alterations in original) (quoting RCW 9.94A.570). However, the statute "says nothing about how to sentence multiple current 'third strikes,' much less whether sentences on these offenses should be served concurrently or consecutively." Id. at 803. But section .589 impliedly specifies those instances in which consecutive sentences are appropriate. Id. We have therefore held that when sentencing multiple current "third strike" offenses, "we apply the default rule that the court must impose concurrent sentences." Id. The State does not dispute that Crumble mandated concurrent sentencing.

C

Rivers argues that the judgment and sentence does not contain his signature. Rivers does not point to any authority that indicates this is error. Furthermore, any error would be harmless. Rivers's presence at the sentencing hearing was noted on the record, Rivers's counsel signed the judgment and sentence, and Rivers's fingerprints were taken on the judgment and sentence. Rivers also signed the notice rights on appeal and the notice of ineligibility to possess a firearm and vote, which were filed on the same day as the judgment and sentence. Rivers does not indicate any prejudice resulting from the absence of his signature on the judgment and sentence.

D

Rivers argues the trial court erred by imposing a legal financial obligation of $6,000 after finding him indigent. The crime victims compensation program (CVCP) requested $6,093.75 from Rivers for Cabrera's funeral expenses. A trial court may determine that an offender is not required to pay restitution, or may

27

relieve the offender of the requirement to pay "where the entity to whom restitution is owed is an insurer or state agency, *except for restitution owed to the department of labor and industries under chapter 7.68 RCW*, if the court finds that the offender does not have the current or likely future ability to pay."  RCW 9.94A.753(3)(b) (emphasis added).  The restitution order here is related to amounts incurred by the CVCP, a self-insurance program operated by the Department of Labor and Industries, so the trial court was not allowed to rescind the restitution order under RCW 9.94A.753(3)(b).  State v. Ellis, 27 Wn. App. 2d 1, 12, 530 P.3d 1048 (2023). The trial court did not err by imposing restitution to the CVCP.

V

Based on the foregoing, except as stated in sections III.C concerning the VPA and IV.B concerning consecutive sentencing, we affirm Rivers's judgment and sentence.  We remand with directions to strike the VPA and make the life sentences concurrent as ministerial matters.

Birk, J.

WE CONCUR:

Chung, J.                                    Smith, C.J.

28